RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0009p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

OMAR RASHAD POUNCY,

                 *Petitioner-Appellee,*

    *v.*

CARMEN DENISE PALMER, Warden,

                   *Respondent-Appellant.*

No. 16-1137

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:13-cv-14695—Matthew F. Leitman, District Judge.

Argued: August 4, 2016

Decided and Filed: January 13, 2017

Before: BOGGS, CLAY, and SUTTON, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** John S. Pallas, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. David L. Moffitt, Bingham Farms, Michigan, for Appellee. **ON BRIEF:** John S. Pallas, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. David L. Moffitt, Bingham Farms, Michigan, for Appellee.

BOGGS, J., delivered the opinion of the court in which SUTTON, J., joined. CLAY, J. (pp. 26–35), delivered a separate dissenting opinion.

_____

**OPINION**

_____

       BOGGS, Circuit Judge. It is well established that the Constitution guarantees criminal defendants the right to self-representation. *Faretta v. California*, 422 U.S. 806, 832 (1975). But

because an accused who manages his own defense relinquishes many of "the traditional benefits associated with the right to counsel," courts must ensure that a defendant who wishes to represent himself does so "knowingly and intelligently," and the record must "establish that 'he knows what he is doing and [that] his choice is made with eyes open.'" *Id.* at 835 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)). Facing a jury trial on charges related to two Michigan carjackings, eighteen-year-old Omar Pouncy waived his right to counsel. This habeas appeal concerns whether he did so voluntarily. After a Michigan jury convicted Pouncy on all charges, he unsuccessfully sought relief in the state court system. Pouncy then petitioned the district court to vacate his convictions on the ground that the state trial court forced him to choose between going to trial with an unprepared attorney and representing himself. The district court concluded that Pouncy faced a "Hobson's choice" and that his waiver of counsel was therefore involuntary. The district court granted Pouncy the writ and the Warden appealed. Because the highly deferential standards applicable to federal collateral review of state-court convictions direct a different result, we reverse.

I

A

In September 2005, Samuel Anderson agreed to display Ralph Haynes's Chevrolet Monte Carlo for sale on his front lawn. A young man, later identified as Omar Pouncy, visited Anderson and asked to have a look at the car. Pouncy left after asking about the price and returned a few days later to meet with Haynes and his brother Dan. Dan agreed to take Pouncy for a ride in the vehicle, but refused Pouncy's request to take the Monte Carlo to Pouncy's own mechanic. With Dan's permission, Pouncy brought his mechanic to Anderson's house instead. Pouncy then indicated that he would return to purchase the vehicle in a few days. On September 24, Pouncy returned to Anderson's house and asked to take Haynes's car for another test drive. Anderson agreed, but while the two were out in the car, Pouncy pulled a gun on Anderson, forced him to get out of the vehicle, and drove away.

At around that same time, Earl Brady's Chevrolet Camaro was on display at Joseph Davis's "racecar chassis fabrication shop." On September 24 or 25, three men entered Davis's

shop and expressed interest in purchasing the Camaro. One of them, also later identified as Pouncy, eventually called Davis and let him know that he was "ready to make a deal." Davis called up Brady, who came to the shop to meet Pouncy, Pouncy's step-brother Wayne Grimes, and another man named Tiakawa Pierce. Pouncy asked if he could take the car to his mechanic's shop to have the vehicle inspected. Brady agreed and drove the Camaro to a house where Pouncy said they would meet the mechanic. While the men waited for the mechanic, Grimes pulled out a gun, demanded the keys to the Camaro, and fired a shot in the air. Brady complied and followed the men's instructions to leave the scene on foot.

A few days later, Thomas Sandstrom advertised his Cadillac for sale in a local paper. A man—again, later identified as Pouncy—called up Sandstrom on October 10 and arranged to inspect the car. The next day, Pouncy and Grimes arrived at Sandstrom's house and asked to take the car to Pouncy's mechanic. Sandstrom agreed and drove the Cadillac to the mechanic's house with Pouncy. Grimes followed in his own car, as did Sandstrom's wife Maria, who was driving her own Chevrolet Corvette. Pouncy directed Sandstrom to a house at the end of a dirt road and, after arriving, asked Sandstrom for the title to the Cadillac. Sandstrom walked over to Maria's car to retrieve the title, but promptly felt Pouncy stick a gun in his side. Pouncy ordered Maria out of her car, demanded Sandstrom's wallet, and instructed the couple to walk away. The Sandstroms eventually managed to flag down a police car, and Maria, who had seen the license plate on Grimes's car, gave the plate number to the police.

Detective James Gagliardi of the Mt. Morris Township Police Department ("MMTPD") took the lead on investigating the theft of Earl Brady's Camaro. After receiving reports of the Sandstrom carjacking, Gagliardi used Maria's tip to track down Grimes. MMTPD officers soon arrested Grimes, who waived his Fifth Amendment rights and agreed to speak with police. Grimes confessed his involvement in the Brady and Sandstrom carjackings, identified Pouncy as the sham purchaser from both thefts, and told police that Tiakawa Pierce had assisted as well. At Gagliardi's request, officers put together photographic lineups with Pouncy and Pierce and showed them to the carjacking victims. Samuel Anderson, Dan Haynes, Earl Brady, Joseph Davis, and Thomas and Maria Sandstrom all identified Pouncy as the sham purchaser from the carjackings. Officers promptly found and arrested Pouncy.

B

The State of Michigan charged Pouncy with several counts of carjacking, armed robbery, felony firearm possession, and being a felon in possession of a firearm, all in relation to the Brady and Sandstrom carjackings. The court appointed attorney Michael Breczinski to represent Pouncy, and Breczinski first appeared on behalf of Pouncy in early November 2005 for a preliminary examination of several of the State's witnesses. Pouncy elected to have his case tried to a jury, and the court scheduled a trial in the Brady and Sandstrom matters for January 10, 2006.

On January 9, Breczinski again appeared on behalf of Pouncy in a pre-trial conference and informed the court that although trial was set for the next day, Pouncy's "investigator was sick for ten days in bed, and . . . has been unable to complete all the investigation in this matter." Breczinski explained that Pouncy's defense was that he had been elsewhere during the carjackings, and so Breczinski had asked the investigator to "loo[k] into all the witnesses." Given that "[t]here's quite a number of them that we [still] have to look at," Breczinski told the judge that he "would be unable to go to trial [tomorrow]." The court rescheduled Pouncy's trial date for January 24.

On January 24, Pouncy appeared in court represented by Breczinski. After the court asked whether the parties wanted to voice anything before voir dire began, Breczinski expressed some concern about his own preparedness for trial:

> THE COURT: All right this is the date set for trial in this matter and first of all is there anything that you need to bring to my attention Mr. Breczinski before we get started here?
>
> MR. POUNCY: I do[,] man, I mean—
>
> THE COURT: Just one second, I'll get to you in just a second. Anything that you have Mr. Breczinski?
>
> MR. BRECZINSKI: Your Honor I talked to my investigator that is retained for this matter, Lennie Ac[c]ardo. I don't have a written report but so far he has been coming up with nothing on some of the leads that we have as to possible alibi witnesses and such. That's what he's told me. He's made numerous calls and seen people and reviewing reports and everything else and . . . talked to my client I know several times. Other than that I don't have a written report, any final

written report from him though. Since I have no details to say whether I'm ready for trial or not is problematic—

THE COURT: Okay.

MR. BRECZINSKI: just because I don't have that full detailed report from him which I was expecting.

. . .

THE COURT: All right Mr. Pouncy do you want to stand sir and what would you like to say sir?

MR. POUNCY: . . . I really don't think . . . we [are] ready to go on because . . . me and my attorney . . . [are] really not . . . on the same page to be honest. This . . . [is] our first time really talkin' and me bein' able to really . . . let him implicate [sic] the things that . . . I have problems with in this report with the inconsistencies. I have, I request[ed] for motions to be filed and no motions w[ere] filed . . . . I know that you have to file for a[n] alibi and I do have a[n] alibi you know, and I gave, I did get with Mr. Ac[c]ardo . . . and I only gave him one number. So it's only one number that he . . . asked for, one number which was part of my alibi . . . . Probably [he has] not got[ten] in contact . . . with the person but it's easy to get in contact with. You know . . . I wrote . . . the [Public] Defender [Service] Administrator and asked for . . . different counsel because I don't really feel satisfied with the one I have and I . . . don't really feel comfortable with talkin' to him 'cause every time we try to talk . . . it's like some kind of conflict [and] we don't get a chance to talk . . . . The longest we ever talked was today and me bein' able to describe . . . discrepancies that I have . . . seen . . . in the . . . [preliminary-hearing] transcripts and the police report, I don't even have the discovery . . . packet . . . . All I have is . . . a size 11 shoe print [found at the scene of the Sandstrom carjackings] . . . [and] Mr. Ac[c]ardo . . . measured my . . . foot print and it was a size 13½. . . . I'm not ready [or] prepared. If I had [new] counsel and a better understanding or if some motions would have been filed [on my behalf] . . . . I'm not gettin' proper representation . . . . I really don't feel comfortable with, with the representation that I have now. I mean[,] . . . the longest I [have] ever talked to [my attorney] . . . was today and that was probably like ten, fifteen minutes and then you called him in and that's the longest and . . . I don't feel comfortable[,] that's all.

The court then asked Breczinski for a response. Breczinski answered that he had visited Pouncy at least "a half-dozen" times in jail. Pouncy confirmed that that was correct but stated that when Breczinski visited, "we don't talk. He come[s] [to] drop off a piece of paper . . . . I don't get to talk to him." Breczinski did not confirm or deny Pouncy's allegations.

Over Pouncy's objections that he had not properly spoken with Breczinski, the trial court explained that Breczinski was a seasoned defense attorney and encouraged Pouncy to trust him:

> THE COURT: [Breczinski's] been practicin' law longer than you've been [alive] okay? If you go and take an automobile to get the transmission rebuilt, you don't go in there and ask the guy who's rebuildin' the transmission every detail that he's doin'. You bring the car in, you drop it off and you come back and pick it up. . . . [Y]ou're in a position where you really just don't have a, a way of judging whether he's a good lawyer or not. And that's just the bottom line.

The court concluded that "I'm not really in a position to grant your request to have new counsel because we're here on the day of trial, we got a jury downstairs that's ready to go[,] and we're go[ing to] try this case today." The court then asked Breczinski about the status of the investigator's report:

> THE COURT: What it sounds like to me then is that the investigator has filed, followed up with the leads and he just hasn't been able to come up with anything. And maybe that's because there may or may not be anything to come up with I don't know. Has Mr. Pouncy said anything to you about filing an alibi notice for him?
>
> MR. BRECZINSKI: Your Honor we have discussed that matter. That's one of the reasons I got the investigator so he could go out and—
>
> THE COURT: If he could find this alibi for him?
>
> MR. BRECZINSKI: find the possible witnesses. Obviously, if there are no other witnesses, [Pouncy] can get up on the stand with or without a notice and say [he] wasn't there. Well you need an alibi notice if you've got other proof witnesses or other material proof of that alibi—
>
> THE COURT: And you have put this investigator in contact with Mr. Pouncy—
>
> MR. BRECZINSKI: Yes.
>
> THE COURT: and Mr. Pouncy has given him the information that he had to locate this person or persons that have the alibi[,] is that correct?
>
> MR. BRECZINSKI: I have also given the investigator copies of everything in my file, copies of the transcripts also from the preliminary exam so he has everything that I have also that he's reviewed. . . . [H]e . . . might see things that I didn't see. He may have seen things that I overlooked because there is a fair bit of material and it is a large bit and there are discrepancies between what I consider sometimes minor discrepancies between what different statements. . . .
>
> THE COURT: That's . . . with every case . . . . But you say they're minor I mean so it doesn't sound like anything glaring by that, by those words that were used.

All right so at least you've had a chance to look into the alibi issue and you've had your investigator look into it?

MR. BRECZINSKI: I've been having him look into it yes. That's why I got the investigator because there were a number of leads which I quite frankly would have been stretched too thin to do it so I needed somebody to do it for me which is why I got an investigator.

After Pouncy provided the judge with a photograph of an acquaintance who looked like Pouncy and who might have been the real perpetrator, counsel explained:

MR. BRECZINSKI: I, I would state Your Honor that that picture and the name was given to Mr. Ac[c]ardo as the idea that [the perpetrator] wasn't [Pouncy], it was someone else that looked like him . . . and it's basically tied in with the alibi so [Accardo] was supposed to look into both situations. As far as I know without a written report of everything [Accardo] did, I don't know that but I assume because of his reputation and past performance that he would have [looked into it] 'cause he's been known to be usually a fairly thorough person.

THE COURT: He is. He's been around for years.

MR. BRECZINSKI: So, you know and so that's been looked into. I haven't heard anything positive to that.

The court then proceeded to ask Breczinski and the prosecutor what the charges and "the guidelines are so at least Mr. Pouncy understands what's goin' on . . . and he can't say he didn't have that information before he goes to trial." After hearing the charges, the court correctly remarked that Pouncy faced a maximum sentence of life in prison on several charges and seemed to allude to two two-year minimum sentences on the charges for felony firearm possession. Then, however, Breczinski, the prosecutor, and the trial court all miscalculated the sentencing guidelines applicable to Pouncy's case. Based on the erroneous calculation, the court told Pouncy that he was subject to a guidelines range of 135 to 337 months in prison, when in reality Pouncy's guidelines range would have been 225 to 562 months in prison. The court concluded that "I can see why [Pouncy] might want to go to trial," based on its mistaken conclusion that "[t]here's not much difference in terms of the guidelines between the [plea offer that Pouncy had rejected] and the original charges." Breczinski did not correct the court's mistake, and Pouncy, citing his innocence, confirmed that he stood by his decision to reject the State's plea offer.

Before the court called the jury in to start trial, the State made two evidentiary motions. First, the State moved to admit evidence of the Haynes carjacking (for which Pouncy was to

stand trial a month later) to prove Pouncy's modus operandi. Breczinski objected on the ground that the State did not need to introduce evidence of the Haynes carjacking because it already had eyewitnesses who would identify Pouncy as the perpetrator of the Brady and Sandstrom carjackings. The court ruled in the government's favor. Second, the prosecutor moved to admit a tape recording of a threatening phone call someone had made to the Sandstroms warning them not to testify about the carjackings. Breczinski responded that "if it was just that we'd be jumping up and down about it. Unfortunately for my client [the State] also . . . informed me . . . that they apparently have the call traced from . . . the Sandstroms[.]" Breczinski explained:

> MR. BRECZINSKI: [The] Sandstroms['] phone records [show] where [the threatening call] originated from and it apparently originated from the holding room down at the Central District Court and a time—

But the prosecutor interrupted to correct Breczinski, explaining that the call had not in fact been traced, and that the State would not "be offering any [technical] proof as to" the origin of the phone call. Instead, the Sandstroms would "just be authenticating the voice on the tape from the[ir] previous dealings with" Pouncy. Nonetheless, despite his previous statement that if the call had not been traced he would be "jumping up and down about" the call's admission, Breczinski said nothing further in opposition to the State's motion, and the judge, after hearing no response from Breczinski, ruled in favor of the government.

The court then called in the prospective jurors, and Breczinski fully participated in voir dire, during which he moved to exclude several potential jurors. With a jury impaneled, the prosecutor delivered an opening statement. Breczinski then asked the court to excuse the jury and explained that Pouncy "wants to make his own opening statement." The court asked Pouncy to stand and proceeded to question him about the request:

> THE COURT: . . . Is it true that you're asking to make your own opening statement?
>
> MR. POUNCY: Yes . . . that is true but I would ask if there are any objections needed that I'm not further, that I'm not known to do is properly object if my attorney can do it because I, because like I first stated to you earlier I haven't even had a conversation, we seen each other—
>
> THE COURT: Mr. Pouncy one second. Sir if you make—
>
> MR. POUNCY: This is my life man.

THE COURT: sir if you make the opening statement, you'll have to represent yourself through this trial. . . . Now if you decide to represent yourself, then [Breczinski is] gonna be sittin' back just as an advisor and that'll be it and you'll be able to get advice from him but you'll be callin' the shots through the entire trial. That includes objections and everything else. And if you don't know when and how to make 'em then I guess, you know, that's, that's on you. Now you say this is your life uh then I would caution you to be very careful as to how you proceed right now . . .

. . .

MR. POUNCY: What, okay basically what I'm sayin' is he, yes he have came to see me, well to drop papers off you know what I'm sayin' about a dozen times. I complained, I complained that I don't, listen, can I—

THE COURT: Yeah[,] I'm listenin'.

MR. POUNCY: I complained that I don't feel comfortable when I, I didn't talk to him, no alibi has been formed, no alibi thing has been called for me man just 'cause stuff happen. If they, if th[e] [prosecution's] witnesses didn't come [to court] they would postpone [the trial]. If the prosecution, hold on—

THE COURT: No that's not true.

. . .

Mr. POUNCY: Okay. Well anyway I haven't got to talk to [Breczinski] about [my] cases . . . . [A]in't nobody gonna take care more, no more than yourself you know what I mean? And . . . I want to just give my opening statement. I'm sittin' here gettin' . . . blamed for somethin' that I didn't do. It's a life you know what I'm sayin'? . . . . It's just that [Breczinski] don't know no more than what he done read 'cause we didn't talk. I didn't (inaudible) on my situation . . . .

THE COURT: . . . Do you wish to represent yourself sir or are you gonna let Mr. Breczinski represent you? . . . [W]hich is it gonna be sir?

MR. POUNCY: So it's not an option . . . even though I complained earlier and don't feel comfortable with the representation, for me to get [another attorney]?

THE COURT: No sir if you want to . . . decide who's gonna represent you then you get your money together and you go hire the lawyer you want to represent you. Otherwise you're gonna get the lawyer that we appoint for you to represent you.

MR. POUNCY: Well yeah I'm gonna hire a lawyer then.

THE COURT: Well I'm sorry sir it's late for that. It's trial day today.

MR. POUNCY: It's too late?

THE COURT: Yes sir. . . . The only issue now is[:] are you gonna let Mr. Breczinski represent you or are you gonna represent yourself, that's the only thing that's on the table right now.

MR. POUNCY: Well let me ask you this. Would you let somebody represent you that didn't come and see you the day before your trial[,] that didn't come and talk to you, that you didn't discuss your case with?

THE COURT: Sir I would let Mr. Breczinski represent me in a heartbeat before I would represent myself with the knowledge that you have.

MR. POUNCY: So will I, I won't be able to talk at all if he talk[s]? I won't be able to say nothin' at all?

THE COURT: No sir. He is gonna represent you. That's what he does. You may get a chance—

MR. POUNCY: He don't listen man he wave me off and all that—

. . .

THE COURT: Mr. Pouncy I, I'm, sir stop. I'm at the end of this conversation 'cause I see where this is goin'.

MR. POUNCY: (Inaudible) please Judge Hayman.

THE COURT: Sir I am not gonna sit here and argue with you. Have a seat please. And Mr. Breczinski it looks like you'll be making the opening statement and representing Mr. Pouncy.

Breczinski proceeded to give a brief opening statement in which he conceded that the carjackings had happened, but disputed that Pouncy was the perpetrator. Breczinski explained that four of the five witnesses who identified Pouncy had fairly little interaction with the perpetrator, and that their eyewitness identifications were thus unreliable. Breczinski concluded by noting the absence of any fingerprint, DNA, or video evidence linking Pouncy to the carjackings, and stated that "if there's a reasonable doubt as to [whether Pouncy was the perpetrator], we'll be asking you to come back with a verdict of not guilty."

After the prosecutor finished examining the State's first witness, Pouncy passed Breczinski a note stating: "I'm gonna represent myself from now on so you can tell the Judge." With the jury excused, Breczinski read the note to the judge, and the judge proceeded to question Pouncy again:

THE COURT: [Y]ou understand [that] you have the right to an attorney and you have the right to Court appointed counsel if you can't afford one, do you understand that?

MR. POUNCY: I don't have [an] attorney right now.

THE COURT: Sir I'm just asking you do you understand your rights sir?

MR. POUNCY: Oh yes I do understand.

THE COURT: You understand that if you represent yourself that I will have to treat you like any other lawyer and if you don't comply with the Court rules I'm gonna have to call you on it you understand that?

MR. POUNCY: Yes sir.

THE COURT: And you understand that Mr. Breczinski will be here just simply to advise you from this trial forth and if you stand up and start representing yourself you're not gonna be able to change horses in the middle of the stream. You're gonna be representing yourself from beginning to end sir. Is that what you really want to do?

MR. POUNCY: Yes. Yes.

THE COURT: Mr. Pouncy I'm gonna tell you that in my opinion you have no business representing yourself, none whatsoever.

MR. POUNCY: The fact that they found the (inaudible) shoe—

THE COURT: Sir I just, sir I just want you to understand that uh—

MR. POUNCY: All right I'm ready to go then.

THE COURT: All right then Mr. Breczinski have a seat and Mr. Pouncy have a seat sir.

Pouncy, who was eighteen years old at the time, proceeded to represent himself for the remainder of his trial.

The trial lasted six days, during which the State called Wayne Grimes, as well as several victims who made unequivocal in-court identifications of Pouncy as the perpetrator. Pouncy did, however, point out inconsistencies in two of the victims' photographic identifications. When given a copy of a photographic lineup and asked which individual they had previously identified as the sham buyer, both Joseph Davis and Thomas Sandstrom failed to pick out Pouncy's photo. Despite having identified Pouncy as the perpetrator to police, Joseph Davis pointed to a lineup photo of a man named Jaakawa McGruder. Thomas Sandstrom pointed to a photo of Wayne Grimes. Pouncy subsequently took the stand in his defense and testified that he was alone at

work at a home-remodeling job when the Brady and Sandstrom carjackings occurred. Pouncy called only one other witness, his mother, who testified that she saw Pouncy at work on the day of the Sandstrom carjacking.

Having heard numerous eyewitness identifications of Pouncy as the perpetrator, the jury convicted Pouncy as charged on four counts of carjacking, four counts of armed robbery, two counts of felony firearm possession, and one count of being a felon in possession of a firearm. The trial court sentenced Pouncy to a term of 586 to 824 months of imprisonment. Just over one month later, Pouncy represented himself in a bench trial on charges arising out of the Haynes carjacking. At the end of that trial, the trial judge convicted and sentenced Pouncy on one count each of carjacking, armed robbery, felony firearm possession, being a felon in possession of a firearm, and carrying a concealed weapon.

C

Pouncy appealed the result of both trials to the Michigan Court of Appeals, where appellate counsel presented more than ten claims for review. Among those was a claim that Pouncy had not waived counsel "knowingly, intelligently, and voluntarily," thereby requiring a new trial under *Faretta v. California*, 422 U.S. 806 (1975). In his counseled appellate brief, Pouncy argued that because courts "must indulge every presumption against waiver" of the right to counsel, an equivocal request for self-representation is not sufficient to establish a knowing, intelligent, and voluntary waiver. Applying this principle to his case, Pouncy claimed that he never made an unequivocal request to represent himself because he had asked if Breczinski could serve as his co-counsel. Pouncy also argued that his waiver of counsel was not intelligently made because the trial court failed to adequately warn him about the risks of self-representation. In addition to his counseled brief, Pouncy filed a separate pro se supplemental brief in which he added an argument that his waiver of counsel was not voluntary because the trial court had not advised him of the minimum and maximum sentences that he faced. Nowhere did Pouncy argue that his waiver of counsel was involuntary because Breczinski was unprepared for trial.

In two separate claims, however, Pouncy argued that Breczinski had rendered ineffective assistance of counsel by failing to present an alibi defense, and that the "trial court also erred by

denying a continuance so that Defendant Pouncy could retain counsel," Explaining the factual basis for both claims, Pouncy's appellate counsel argued that Pouncy had "decided to represent himself because of his dissatisfaction with appointed counsel and because of the trial court's refusal to grant a continuance to obtain other counsel, either appointed or retained." The failures of counsel and the trial court thus combined to deny Pouncy "his right to effective assistance of counsel and his right to a continuance to retain counsel of his choice."

The Michigan Court of Appeals began by addressing Pouncy's first two arguments that "his waiver was contingent on the appointment of standby counsel and that he was not properly informed of the risks inherent in self-representation." *People v. Pouncy*, Nos. 269298, 270604, 2008 WL 9869818, at *4 (Mich. Ct. App. Mar. 25, 2008). Based on the fact that Pouncy had "repeatedly raised the issue of self-representation," the court concluded that his request to represent himself had been unequivocal. *Id.* at *8. The court also rejected Pouncy's second argument that the trial court's warnings had failed to adequately inform him of the dangers of proceeding pro se, reasoning that "the trial court explained that defendant would be bound to comply with the court rules, which included making 'objections and everything else,'" and also "advised defendant of the charges against him, including the minimum and maximum prison sentences associated with the various charges." *Id.* at *9. The court concluded that "[t]he trial court did not clearly err when it determined that defendant knowingly, intelligently and voluntarily waived his right to counsel. Therefore, the trial court did not err when it permitted defendant to represent himself." *Id.* at *10.

The Michigan Court of Appeals then turned to Pouncy's argument that the trial court should have ordered a continuance "in order to give [him] time to obtain alternate [appointed] counsel after he expressed dissatisfaction with his current counsel." *Ibid.* The court rejected the claim, explaining that although a complete collapse of the attorney-client relationship could warrant a continuance, Pouncy's "dissatisfaction with how Breczinski was handling the case did not adequately demonstrate a breakdown in the attorney-client relationship to warrant substitution of [appointed] counsel." *Id.* at *11. As for Pouncy's request for time to obtain retained counsel, the court concluded that because Pouncy "did not make a formal motion for a continuance," the "trial court cannot be faulted for failing to grant" one. *Ibid.* The court further

explained that even a formal request would have been properly denied because Pouncy "failed to demonstrate that [Breczinski] was not providing him with effective assistance and the purported request did not come until trial was already underway." *Ibid.*

With respect to Pouncy's ineffective-assistance-of-trial-counsel claim premised on Breczinski's failure to present an alibi defense, the Michigan Court of Appeals made the following findings of fact and rejected Pouncy's claim:

> [In January,] Breczinski moved to adjourn trial on the ground that he had not yet been able to investigate numerous witnesses allegedly related to [Pouncy's] defense. The trial court granted the motion and rescheduled the trial for later that same month. The morning of trial, defendant complained that Breczinski had not prepared an alibi defense. However, the record shows that Breczinski hired an investigator for the specific purpose of tracking down and interviewing potential alibi witnesses. The investigator met with [Pouncy] to collect the names of potential witnesses. [Pouncy] conceded that he only gave the investigator the name and number for one potential witness. The investigation apparently revealed no legitimate potential for an alibi defense. Therefore, Breczinski was not ineffective for failing to raise a futile defense.

*Id.* at *19.

The court rejected Pouncy's remaining assignments of error in his jury trial and affirmed the relevant convictions and sentences. *Id.* at *35. However, the court vacated Pouncy's convictions obtained after the subsequent bench trial related to the Haynes carjacking on the ground that the trial court had never even attempted to obtain a waiver of counsel before allowing Pouncy to represent himself in that case. *Id.* at *30–32, 35. The Michigan Supreme Court denied Pouncy leave to appeal. *People v. Pouncy*, 753 N.W.2d 187, 187–88 (Mich. 2008) (mem.).

In 2009, Pouncy filed a counseled motion for relief from judgment containing several constitutional claims, which he supported with two affidavits that apparently showed that he had been confined in the county jail at the time of the Haynes carjacking, along with an affidavit from Tiakawa Pierce—who did not testify at trial—stating that Jaakawa McGruder—the man whom Joseph Davis identified when shown the photo lineup at trial—and not Pouncy, had accompanied Pierce and Grimes on the Brady and Sandstrom carjackings. Additionally, Pouncy submitted evidence showing that a phone number to which officers had finally traced the

witness-intimidation calls belonged to McGruder.  Pouncy also filed a pro se supplement to his counseled motion, which included several arguments for why his waiver of counsel was involuntary, including a claim that "Pouncy's waiver of counsel was not a product of a free and meaningful choice" because he "was forced to choose between self admitted[ly] unprepared counsel or no counsel at all."

The state trial court rejected Pouncy's waiver-of-counsel claim and denied his postconviction motion in full.  With respect to the *Faretta* claim, the court explained that under Michigan Court Rule 6.508(D), it was prohibited from granting relief on any "grounds . . . which were decided against the defendant in a prior appeal or proceedings under this subchapter, unless the defendant establishes that a retroactive change in the law has undermined the prior decision." The court elaborated on Pouncy's argument "that his choice between incompetent counsel and self representation [was] no choice at all," explaining that "the Court of Appeals . . . decided this issue against [Pouncy] in his [direct] appeal.  Th[at] [c]ourt looked to the multiple arguments of ineffective assistance of counsel presented by Defendant and ultimately held that [Breczinski] was not ineffective."

Pouncy appealed the denial of his postjudgment motion to the Michigan Court of Appeals but expressly abandoned the involuntary-waiver-of-counsel claim, explaining that the claim was "addressed in Pouncy's direct appeal and [is] [therefore] not addressed in this app[eal]."  The Michigan Court of Appeals and Michigan Supreme Court denied relief in unexplained orders.

D

In November 2013, Pouncy filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Michigan, asserting fourteen claims for relief, one of which was that Pouncy's waiver of counsel was not knowingly, intelligently, and voluntarily made.  In support of the claim, Pouncy reiterated several arguments that he made in his pro se supplement to his counseled motion for relief from judgment, including an argument that his waiver of counsel was not voluntary because Breczinski was unprepared for trial.  In support, Pouncy submitted a November 10, 2015, affidavit signed by Breczinski, in which Breczinski stated that he had depended "entirely upon Mr. Accardo," the investigator, "to develop and

provide me with a written investigative report prior to trial that would enable me to make informed strategic decisions before and in trial," and "[w]ithout knowing the extent of Mr. Accardo's investigations and without any details in this regard, I confirm as I expressed on-the-record on January 24, 2006 that I was unprepared to proceed to trial without the investigative report."

After considering Pouncy's "Hobson's choice" argument, the district court granted Pouncy's petition. *Pouncy v. Palmer*, 165 F. Supp. 3d 615, 631 (E.D. Mich. 2016). The district court held that the deferential standard set forth in 28 U.S.C. § 2254(d) applied to Pouncy's claim because the Michigan Court of Appeals "understood Pouncy's argument [on direct appeal]—at least in a general sense—to be that he 'did not knowingly, intelligently, and voluntarily waive his right to have counsel represent him at trial.' And that court purported to apply the *Faretta* standard to Pouncy's . . . . invalid-waiver-of-counsel claim." *Id.* at 625 n.2 (quoting *Pouncy*, 2008 WL 9869818, at *4). Despite its conclusion that 28 U.S.C. § 2254(d) applied, the district court agreed with Pouncy and determined that the Michigan Court of Appeals's decision involved an unreasonable application of clearly established federal law and an unreasonable appraisal of the facts before it, and concluded that Pouncy had shown entitlement to habeas relief. *Id.* at 630.

The district court explained that Pouncy's trial began "a mere ten weeks after his arraignment," and that "Breczinski expressed concern about whether he was sufficiently prepared to begin trial" because he had not received the investigator's "final written report." *Id.* at 618. The court recounted that Breczinski never disputed Pouncy's claim that he had not spoken at length with his client, *id.* at 628, and that Breczinski "candidly admitted that he did not 'know' whether the investigator had, in fact, conducted a complete review" of Pouncy's case, *id.* at 618. The district court also determined that Breczinski failed to meaningfully respond to either of the prosecutor's motions in limine, grossly underestimated Pouncy's guidelines sentence, and delivered only a brief opening statement. *Id.* at 619–21, 627–28. From these observations, the district court concluded that:

> [t]he record contains compelling evidence that . . . Breczinski[] was woefully unprepared; that Pouncy did not want to represent himself; that the trial judge denied Pouncy the opportunity to hire an attorney at his own expense; and that

Pouncy chose to represent himself because Breczinski was so unprepared and the trial [c]ourt left him with no other viable alternative [to self-representation].

*Id.* at 627–28.

Reasoning from the premise that "[i]f a choice presented to a petitioner is constitutionally offensive, then the choice cannot be voluntary," *id.* at 629 n.6 (quoting *Wilks v. Israel*, 627 F.2d 32, 35 (7th Cir. 1980)), the district court determined that Pouncy's waiver of counsel had been involuntary. *Id.* at 630–31. Because, in the district court's view, the Michigan Court of Appeals "entirely fail[ed] to account for the *context* in which Pouncy 'raised the issue of self-representation,'" it ignored the "Hobson's choice that Pouncy faced when he decided to represent himself," resulting in an unreasonable application of *Faretta*. *Id.* at 630. Insofar as the Michigan Court of Appeals found that Breczinski's private investigator turned up "no legitimate potential for an alibi defense," *ibid.* (quoting *Pouncy*, 2008 WL 9869818, at *19), the district court concluded that this finding "cannot be squared with the record as it existed when Pouncy decided to represent himself." *Id.* at 631. The court instructed the Warden to release Pouncy from custody unless the State took steps to afford him a new trial within ninety days. *Ibid.* The Warden appealed, and we now reverse.

II

Our review of Pouncy's *Faretta* claim is subject to the restrictions imposed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. Enacted with the purpose of advancing the goal of "promoting 'comity, finality, and federalism,'" *Carey v. Saffold*, 536 U.S. 214, 220 (2002) (quoting *Williams v. Taylor*, 529 U.S. 420, 436 (2000)), AEDPA "sharply limits the circumstances in which a federal court may issue a writ of habeas corpus to a state prisoner whose claim was 'adjudicated on the merits in State court proceedings.'" *Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013) (quoting 28 U.S.C. § 2254(d)). So long as a state prisoner's claim has been "adjudicated on the merits" in state court, 28 U.S.C. § 2254(d), a federal court may not disturb the state-court judgment except in two situations.

First, habeas relief may be available when the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Id.* § 2254(d)(1). A state-court decision is "contrary to" clearly established federal law where the "state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Metrish v. Lancaster*, 133 S. Ct. 1781, 1786 n.2 (2013) (quoting *Williams*, 529 U.S. at 412–13). A state court's decision involves an "unreasonable application of" federal law if the "state-court decision 'identifies the correct governing legal principle' in existence at the time," but "unreasonably applies that principle to the facts of the [petitioner's] case." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) (quoting *Williams*, 529 U.S. at 413).

Second, habeas relief may also be warranted where the state-court adjudication "resulted in a decision that was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2). To show that a state court's determination of the facts was "unreasonable," it is not enough that the "federal habeas court would have reached a different conclusion in the first instance," *Wood v. Allen*, 130 S. Ct. 841, 849 (2010); "[a] state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007) (first quoting 28 U.S.C. § 2254(d)(2), then quoting *id.* § 2254(e)(1)).

On appeal from a district court's decision to grant or deny a state prisoner's petition for habeas corpus relief, we review de novo the district court's legal conclusions and mixed questions of law and fact, including the question whether the state court's adjudication was "contrary to, or involved an unreasonable application of, clearly established federal law." *Moore v. Mitchell*, 708 F.3d 760, 774 (6th Cir. 2013). Although we review the district court's findings of fact for clear error, *ibid.*, we give plenary review to any such findings that are based on the district court's review of state-court record. *Boggs v. Collins*, 226 F.3d 728, 736 (6th Cir. 2000).

III

The initial question in this appeal is whether the deferential standard set forth in 28 U.S.C. § 2254(d) applies to Pouncy's claim. AEDPA deference applies only to "claim[s]" that were "adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d), and Pouncy argues that the Michigan Court of Appeals never expressly adjudicated the "Hobson's choice" version of his *Faretta* claim, and that this court should therefore review his *Faretta* claim without reference to 28 U.S.C. § 2254(d). In support of this contention, Pouncy points out that although he made several arguments in support of his involuntary-waiver-of-counsel claim on direct appeal, none of those arguments were premised on the theory that his waiver of counsel was involuntary due to the lack of a meaningful alternative to self-representation.

Although Pouncy is correct that AEDPA deference does not apply to a claim that a state court never adjudicated, *see Sowell v. Bradshaw*, 372 F.3d 821, 830–31 (6th Cir. 2004), the Michigan Court of Appeals did adjudicate his *Faretta* claim. As a preliminary matter, as Pouncy himself conceded on appeal from the state trial court's denial of his motion for relief from judgment, his "Hobson's choice" theory does not amount to a distinct claim. A "claim" for purposes of AEDPA is "an asserted federal basis for relief from a state court's judgment of conviction." *Gonzalez v. Crosby*, 545 U.S. 524, 530 (2005). Where new evidence in support of a previously argued basis for relief leaves the "gravamen of [a petitioner's] legal argument . . . essentially" unchanged, *Babbitt v. Woodford*, 177 F.3d 744, 746 (9th Cir. 1999) (per curiam), courts interpreting the word "claim" in 28 U.S.C. § 2244(b) have hesitated to hold that a petitioner's evidence of such additional evidence creates a new "claim." *See, e.g., In re West*, 402 F. App'x 77, 79 (6th Cir. 2010); *United States v. Allen*, 157 F.3d 661, 664 (9th Cir. 1998); *Felder v. McVicar*, 113 F.3d 696, 698 (7th Cir. 1997); *see also Brannigan v. United States*, 249 F.3d 584, 588 (7th Cir. 2001).

Although this appeal concerns the definition of a "claim" for purposes of 28 U.S.C. § 2254(d), the same result obtains here. The essence of the "federal basis for relief" presented in this court, namely, that Pouncy's waiver of counsel was involuntary, is no different from that which Pouncy brought to the Michigan Court of Appeals on direct appeal. The only difference is that Pouncy now places particular emphasis on evidence of Breczinski's lack of preparedness in

the state-court record.  Because this evidence does not meaningfully alter the legal conclusion that Pouncy asserted in the Michigan Court of Appeals on direct appeal, his "Hobson's choice" theory is appropriately characterized as presenting not an independent claim, but rather emphasizing new evidence or argumentation in support of an old claim.  And because the Michigan Court of Appeals "adjudicated" that claim "on the merits," the deferential standards set forth in 28 U.S.C. § 2254(d) constrain our review.

This conclusion finds further support in the fact that the Michigan Court of Appeals implicitly rejected Pouncy's "Hobson's choice" argument when it concluded that he "knowingly, intelligently and voluntarily waived his right to counsel." *Pouncy*, 2008 WL 9869818, at *10.  In arriving at that conclusion, the state appellate court was aware that "[t]he existence of a knowing and intelligent waiver of counsel depends on the particular facts and circumstances of a case" and "review[ed] de novo the entire record" with this principle in mind.  *Id.* at *4–8.  The remainder of the court's opinion reveals that its de novo review included consideration of Breczinski's preparedness for trial:  In adjudicating Pouncy's claim that the trial court erred in denying him substitute appointed counsel, the court held that there was no "breakdown in the attorney-client relationship" and that Pouncy's "allegations that Breczinski was ineffective" lacked support in the record.  *Id.* at *11. The court also explicitly rejected Pouncy's contention that Breczinski was unprepared on the day of trial, concluding that Accardo's "investigation apparently revealed no legitimate potential for an alibi defense."  *Id.* at *19.   Under these circumstances, we agree with the district court that the Michigan Court of Appeals adjudicated "on the merits" the claim currently before this court.  28 U.S.C. § 2254(d).

IV

Because Pouncy's *Faretta* claim was "adjudicated on the merits in State court proceedings," we may not grant the writ unless the Michigan Court of Appeals's adjudication of that claim "resulted in a decision that was contrary to, or involved an unreasonable application of" clearly established federal law as determined by the Supreme Court or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  *Ibid.*  Moreover, insofar as Pouncy alleges that the Michigan Court of Appeals unreasonably applied clearly established law, Pouncy must show not only that the

state court's application of law to fact was unreasonable, but also that no reasonable arguments or theories "*could have supported*" the *result* of the state court's analysis, *Davis v. Carpenter*, 798 F.3d 468, 475 (6th Cir. 2015); *see also Holland v. Rivard*, 800 F.3d 224, 235–36 (6th Cir. 2015). Pouncy is not entitled to relief under these extremely deferential standards.

"The Sixth Amendment right of self-representation differs from other constitutional rights because it can not be exercised without the concomitant waiver of another fundamental right that is also guaranteed under the Sixth Amendment; the right to counsel." *Buhl v. Cooksey*, 233 F.3d 783, 789 (3d Cir. 2000). For this reason, before a defendant may exercise his right to self-representation, he must "knowingly and intelligently" waive his right to counsel, which is the case only if he is "aware of the dangers and disadvantages of self-representation." *Faretta*, 422 U.S. at 835. Trial courts and courts on direct review must "indulge every reasonable presumption against waiver," *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938), and the Constitution thus imposes a corresponding duty on trial courts to ensure that a defendant's waiver is knowing and intelligent. *Faretta*, 422 U.S. at 835. In carrying out this duty, courts must "loo[k] at all of the circumstances surrounding waiver of counsel to ensure that such waiver was knowing and intelligent." *James v. Brigano*, 470 F.3d 636, 644 (6th Cir. 2006) (discussing *Faretta*); *see also Iowa v. Tovar*, 541 U.S. 77, 92 (2004).

With these few, but fundamental, "clearly established" principles in mind, our threshold inquiry is whether any Supreme Court precedent also clearly establishes the proposition that a defendant's decision to waive counsel cannot be voluntary where his retained counsel is unprepared. *See Carey v. Musladin*, 549 U.S. 70, 77 (2006). A legal principle is "clearly established" only if it is "embodied in a holding of th[e] [Supreme] Court." *Thaler v. Haynes*, 559 U.S. 43, 47 (2010) (per curiam). In conducting the "clearly established" inquiry, lower courts must narrowly construe Supreme Court precedents and, as a consequence, "clearly established" law "consist[s] only of something akin to on-point holdings." *House v. Hatch*, 527 F.3d 1010, 1015 (10th Cir. 2008).

Because the Supreme Court has never confronted a situation in which a defendant decided to waive counsel due to his attorney's lack of preparedness, we have doubts about whether any "clearly established" Supreme Court law applies here. For example, without any

guidance from the Supreme Court, one is left to wonder about the interaction of *Faretta* and the standards for gauging the ineffectiveness of counsel set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and *United States v. Cronic*, 466 U.S. 648 (1984), in circumstances such as these. Additionally, no Supreme Court precedent explains just how unprepared counsel must be before a court may deem a waiver of counsel to be involuntary, nor does any Supreme Court holding address the question whether a mistaken but reasonable belief that counsel is unprepared suffices to render a waiver of counsel involuntary. We appreciate the dissent's concern with the decision by the Michigan Court of Appeals to incorporate *Strickland*'s ineffectiveness standard into its *Faretta* analysis. Were we to evaluate Pouncy's claim *de novo*, we might very well apply a different standard in this case. However, under AEDPA, federal habeas courts must tread carefully in the absence of more specific holdings from the Supreme Court. *See, e.g.*, *Thaler v. Haynes*, 559 U.S. 43, 47–48 (2010).

Nonetheless, we have previously interpreted the basic teaching of *Iowa v. Tovar*, 541 U.S. 77 (2004), *Faretta*, and *Johnson v. Zerbst*, 304 U.S. 458 (1938)—that the voluntariness of a waiver is measured by reference to the surrounding circumstances—as clearly establishing the principle that "the choice between unprepared counsel and self-representation is no choice at all." *James*, 470 F.3d at 644 (quoting *Fowler v. Collins*, 253 F.3d 244, 249–50 (6th Cir. 2001)) (applying 28 U.S.C. § 2254(d)). But even if *Tovar*, *Faretta*, and *Johnson* "clearly establis[h]" the "Hobson's choice" principle that Pouncy invokes on appeal, Pouncy faces an uphill battle in showing that no proper application of those holdings could lead to the conclusion that Pouncy voluntarily waived his right to counsel. Not only does Pouncy, as a habeas petitioner, bear the ultimate burden of proving that his waiver of counsel was involuntary, *see Glass v. Pineda*, 635 F. App'x 207, 214 (6th Cir. 2015); *Akins v. Easterling*, 648 F.3d 380, 395 (6th Cir. 2011), but also those habeas courts that have applied the principle that "a choice between proceeding with incompetent counsel or no counsel is . . . no choice at all" have emphasized that to succeed on such a claim, a petitioner must prove that appointed counsel was actually incompetent. *Wilks*, 627 F.2d at 36. Doing so is no easy task.

In *James v. Brigano*, 470 F.3d 636 (6th Cir. 2006), for example, a petitioner's appointed trial counsel asked for a continuance, moved to withdraw, and unequivocally told the court that

he "could not properly represent [his client] and get him a fair trial." *Id.* at 639. Similarly, in *Pazden v. Maurer*, 424 F.3d 303 (3d Cir. 2005), appointed trial counsel "stated several times on the record that she could not be prepared to go to trial," had not had time to interview the witnesses on the prosecution's witness list, and had not had an opportunity to review discovery materials due to the State's delay in responding to discovery requests. *Id.* at 315. In neither *James* nor *Pazden* was it even arguable that counsel could provide effective representation at trial. By contrast, the state-court record in this case can reasonably be squared with the Michigan Court of Appeals's conclusion that Breczinski was adequately prepared for trial, as well as the proposition that when trial began, it seemed quite clear that Accardo's investigation had turned up nothing.

We cannot, of course, ignore Breczinski's statement that it was "problematic" to say whether he was prepared for trial. When viewed out of context, this remark is undoubtedly concerning. But Breczinski followed his comment by stating that he hesitated "just because" he had not received Accardo's final report. Breczinski told the court that he had spoken with Accardo and that despite having made "numerous calls and seen people and reviewing reports and everything else" in the two weeks since trial was postponed, Accardo "has been coming up with nothing." Moreover, as the Michigan Court of Appeals recognized, Pouncy gave Accardo only one potential alibi witness to contact, suggesting that if Accardo was "coming up with nothing," there was very likely nothing to find. This proposition finds further support in Breczinski's statement that Accardo had a reputation as a thorough investigator.

Moreover, Breczinski himself seemed to be ready for trial based on the information that he did have. Breczinski's on-the-record statements imply that he had read all of the materials in Pouncy's file, which included transcripts from the preliminary examinations of the State's witnesses, and had found only minor discrepancies in the State's witnesses' testimony. Breczinski also vigorously participated in voir dire, and revealed his knowledge of the prosecution's case during his opening statement. Although Pouncy repeatedly complained that Breczinski had not spoken with him at length about the case, Pouncy characterized the problem as a personal disagreement, not necessarily one about Breczinski's preparedness: Pouncy explained that "every time we try to talk . . . it's like some kind of conflict." Indeed, Breczinski

confirmed that he had visited jail at least six times—Pouncy later estimated it as a "dozen"—and explained that he had spoken with Pouncy about filing an alibi notice and had hired Accardo as a result. This evidence could support the conclusion that Breczinski was prepared and had not heard anything more from Accardo because Accardo had simply found nothing to support Pouncy's case.

It is true that viewing the evidence in this light involves giving less weight than the district court did to those parts of the record that suggest that Breczinski was less than prepared. In particular, one would have to discount the fact that Breczinski did not object to the prosecutor's motion to admit the phone-call recording after learning that it had not been traced, as well as the fact that Breczinski appeared to have miscalculated the applicable sentencing guidelines. But Pouncy does not explain how Breczinski could have opposed the motion given that the prosecutor promised to authenticate the call "from the victim's dealings with Mr. Pouncy." As for counsel's error in calculating the sentencing guidelines, that error could have had no bearing on Pouncy's assessment of Breczinski's preparedness because Pouncy had no knowledge of the actual guidelines range he faced at the time he waived counsel. Insofar as it is indicative of Breczinski's overall level of preparedness, we note that it is sometimes difficult to estimate the applicable guidelines range before trial given that many potentially relevant facts have not been proven. *Cf., e.g.*, *Wright v. Lafler*, 247 F. App'x 701, 705 (6th Cir. 2007).

More importantly, an attorney whose preparation is constitutionally acceptable need not be perfect, *cf. Burt v. Titlow*, 134 S. Ct. 10, 18 (2013), and even if the majority of fairminded jurists would agree with the district court's appraisal of the law and facts, one could read the record and conclude—based on the above facts—that Breczinski was sufficiently prepared that Pouncy's waiver of counsel was the product of voluntary choice. *Cf. James*, 470 F.3d at 644 ("[T]he choice between *unprepared* counsel and self-representation is no choice at all." (emphasis added)). For this reason, we are left to conclude that Pouncy's "Hobson's choice" theory does not entitle him to relief under AEDPA's deferential standard.

This conclusion does not mean that all is lost for Pouncy. For one thing, Pouncy has raised a number of federal constitutional claims in his habeas petition on which the district court has yet to rule. Nothing in this opinion prevents Pouncy from arguing those claims in the district

court on remand. Pouncy has also advanced several other arguments in support of his claim that the Michigan Court of Appeals's application of *Faretta* resulted in a decision that was contrary to, or an unreasonable application of, clearly established law or one that was based on an unreasonable assessment of the facts of his case. 28 U.S.C. § 2254(d). Because "we rely on the district courts' 'valued judgment,' which 'adds much to the deliberative process and allows this court its proper function—to determine if an erroneous decision was made as to the issues presented,'" *In re Anheuser-Busch Beer Labeling Marketing & Sales Practices Litig.*, 644 F. App'x 515, 533 (6th Cir. 2016) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 245 (6th Cir. 1991)), we think it the wiser course to refrain from considering those arguments for the first time on appeal.

V

By design, AEDPA reaffirms Congress's respect for, and confidence in, state courts by emphasizing their central role in remedying constitutional errors and correcting injustices in state criminal-justice systems. We harbor little doubt that this trust is well placed, as we have every confidence that our state-court colleagues take seriously evidence of innocence like the affidavits and other evidence that Pouncy advanced. The corollary, however, is that no matter how wrong a federal court may think a state court's application of federal law or analysis of the facts, we may not disturb state-court judgments in criminal cases unless the state court's ruling on a federal constitutional question "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). Because we cannot conclude that the Michigan Court of Appeals's adjudication of Pouncy's *Faretta* claim is so unmistakably unreasonable, we must REVERSE the judgment of the district court and REMAND this case for further proceedings not inconsistent with this opinion.

---

**DISSENT**

---

CLAY, Circuit Judge, dissenting.  The uncontested record before us clearly demonstrates that Omar Pouncy was forced to choose between representing himself and being represented by unprepared counsel—sometimes referred to as a "Hobson's Choice."  While it is undoubtedly true that Pouncy was entitled to represent himself, *see Faretta v. California*, 422 U.S. 806 (1975), such a right is only properly invoked when the choice to represent oneself is made freely with "eyes open." *Id.* at 835.  In Pouncy's case, his invocation of the right to represent himself was involuntary because "the choice between unprepared counsel and self-representation is no choice at all." *James v. Brigano*, 470 F.3d 636, 644 (6th Cir. 2006) (citing *Fowler v. Collins*, 253 F.3d 244, 249–50 (6th Cir. 2001)).  Because I believe that the state courts unreasonably applied Supreme Court precedent in ruling that Pouncy's *Faretta* right was not violated in spite of Pouncy being forced into a Hobson's Choice, I respectfully dissent.

As an initial matter, it is clear that the standards announced in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214 (1996), govern this case, meaning that we can only grant habeas relief where the state court's reasoning is "contrary to" or constitutes an "unreasonable application" of clearly established Supreme Court law.  28 U.S.C. § 2254(d).  As noted by the majority, under the "unreasonable application" prong, "a habeas court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).  Applying this standard, we must ask whether the state court unreasonably found that Pouncy's invocation of his right to self-representation, along with his waiver of his right to counsel, was "knowing, voluntary, and intelligent." *Iowa v. Tovar*, 541 U.S. 77, 88 (2004).

Even with the deferential standard mandated by AEDPA, I would affirm the district court's granting of habeas relief to Pouncy on his Hobson's Choice claim because it cannot

reasonably be said that Pouncy voluntarily waived his right to counsel in invoking his right to represent himself, as required by *Faretta*. *See Tovar*, 541 U.S. at 87–88 (2004) (explaining that, "[w]hile the Constitution does not force a lawyer upon a defendant, it does require that any waiver of the right to counsel be knowing, voluntary, and intelligent" (internal quotations omitted)). Instead, Pouncy was forced to make exactly the constitutionally-abhorrent choice between representing himself and being represented by unprepared counsel that this Court, along with several of our sister circuit courts, has recognized violates the Constitution.

Specifically, in *James v. Brigano*, this Court recognized that "the choice between unprepared counsel and self-representation is no choice at all." 470 F.3d at 644 (citing *Fowler*, 253 F.3d at 249–50). In that case, the petitioner was forced to represent himself because the court-appointed attorney was admittedly unprepared for trial and the trial judge was "intent on going forward with trial regardless of appointed counsel's preparedness." *Id.* Applying the standards mandated by AEPDA, we determined that the state court's finding that the petitioner knowingly and voluntarily waived his right to counsel in this context was unreasonable, meaning that habeas relief was appropriate. *Id.* Similarly, in *Padzen v. Maurer*, 424 F.3d 303 (3d Cir. 2005), which also applied the deferential standards mandated by AEDPA, the United States Court of Appeals for the Third Circuit held that the petitioner's waiver of counsel was involuntary because he was forced to choose between representing himself and being represented by counsel who, among other deficiencies, had not been able to review the evidence fully nor interview all the witnesses. *Id.* at 315. While the judge in that case "did inquire into whether [the petitioner] knowingly, intelligently and voluntarily relinquished his Sixth Amendment rights," he "either ignored [the petitioner's] answers or failed to realize their constitutional significance." *Id.* at 319. Therefore, the petitioner's waiver was "not voluntary in the constitutional sense," and the state court's determination to the contrary constituted an unreasonable application of the law as announced by the Supreme Court. *Id.*

Pouncy's case is markedly similar to those of *James* and *Padzen*. In all three cases, the petitioner was forced into representing himself because of an unprepared defense attorney, thus making the waiver of the right to an attorney involuntary. As the record makes clear, and as he himself stated on the record, Michael Breczinski, Pouncy's defense counsel, was woefully

unprepared for trial.  In fact, even counsel for the Warden, when asked during oral argument in front of the district court to point to evidence in the record that showed that Breczinski actually was prepared for trial, could not come up with anything other than that Breczinski "was there" and "making arguments."  (R. 73, PageID #6720, 6724–25.)

Breczinski's unpreparedness manifested itself at various points during his representation of Pouncy.  Specifically, when asked by the trial judge whether there were any concerns that needed to be addressed before selecting a jury, Breczinski raised the issue of his own unpreparedness and stated that it was "problematic" for him to say whether he was ready for the trial, as he had not yet received anything from his investigator beyond an oral report stating that the investigator had not been able to find any alibi witnesses as of yet.  (R. 8-7, PageID #459.) Notably, Breczinski claims he sought the aid of an investigator in the first place because the amount of materials involved in the case was extensive, and he would have been "stretched too thin" to investigate all the leads himself.  (*Id.* at 468.)  This investigator was thus charged with interviewing "quite a number" of potential witnesses, among his other duties.  (R. 8-6, PageID #452.)  When asked on the record whether both he and his investigator were looking into Pouncy's alibi defense—the main defense that was to be used at trial—Breczinski only stated that his investigator was looking into the matter.  Given these statements, it is apparent that Breczinski was heavily relying on his investigator to review the case and supply Pouncy with his alibi defense.

The investigator, however, never finished his investigation, as evidenced by his failure to provide Breczinski with a final report.[1]  This failure, especially given the investigator's reputation as a thorough investigator, should have indicated to the judge that the defense had not adequately prepared for trial.  However, the judge relied instead only on the investigator's reputation to *assume* that he had pursued all potential leads but failed to find any evidence that would aid in Pouncy's defense.  Based only on this assumption, in the complete absence of verification, the judge decided to continue with the trial as scheduled and to ignore Breczinski's statement that it was problematic for him to say he was ready for trial.

---

[1]Such a finding is bolstered by the fact that, two weeks before the trial, Breczinski informed the court that his "investigator was sick for ten days in bed, and . . . has been unable to complete all the investigation in this matter."  (R. 8-6, PageID #452.)

As the district court noted, Breczinski's unpreparedness was evidenced at another crucial point before jury selection. When asked to respond to the prosecutor's motion *in limine* to admit into evidence a recording of a phone call in which Pouncy allegedly threatened a witness, Breczinski acquiesced to the recording's admittance because he erroneously believed that the prosecutor had electronically traced the phone call back to Pouncy. However, even after the prosecutor corrected this unwarranted assumption and informed Breczinski that the call had not, in fact, been traceable, Breczinski still did not object to its admission. This failure is all the more incredible given that the only evidence the prosecution was offering to prove that Pouncy was the caller was the victims' testimony that the voice matched Pouncy's, even though the victims had previously had fairly little interaction with Pouncy, apart from a phone call and a brief in-person meeting. In fact, Breczinski's failure to object to the tape's introduction flew in the face of his earlier statement that, if the prosecution had not traced the call back to Pouncy, he would be "jumping up and down" opposing the tape's admission. (R. 8-7, at 486.) This failure to object makes it quite clear that Breczinski was unprepared for trial in that he did not fully comprehend what evidence would be presented against his client.

Given his counsel's performance up until the eve of trial, it was understandable that Pouncy was concerned that he was not being adequately represented. Prior to the trial's start, Pouncy had met with Breczinski around six times, but each one of those meetings was short and perfunctory and, according to Pouncy, consisted mostly of Breczinski delivering paperwork. Then Pouncy heard his counsel say that he was not prepared for trial and witnessed him fail to meaningfully oppose the two motions *in limine*. At this point, Pouncy began asking the judge to postpone the trial, to appoint him new counsel, to allow him to hire new counsel, to allow him to represent himself as co-counsel with Breczinski, and finally, when all other options were denied, to represent himself.

The evidence establishes that Pouncy felt that he was being forced to represent himself because his only other option was to have Breczinski represent him, despite being unprepared to do so. At various points during the first day of trial, Pouncy told the judge that he did not "feel comfortable" going to trial with Breczinski representing him because he was "not getting proper representation." (*Id.* at 461–62.) Even after raising these concerns, Pouncy did not finally

commit to representing himself until after opening statements and direct examination of the first witness, despite the judge mentioning it several times earlier in the day.**2** In fact, because the judge would not appoint new counsel for him, Pouncy explored with the judge alternatives to representing himself and even offered to hire his own lawyer to represent him. Nevertheless, the judge foreclosed that option as well and told Pouncy that if he was going to hire a new attorney he "should have [done] it a long time ago. This is trial day today." (*Id.* at 672.) The judge put the issue quite succinctly, stating that "[t]he only issue now is . . . are you gonna let Mr. Breczinski represent you or are you gonna represent yourself, that's the only thing that's on the table right now." (*Id.*) Given these two options, Pouncy decided to represent himself. Even so, when the judge conducted the final waiver colloquy and asked Pouncy to confirm that he understood that he had the right to appointed counsel, Pouncy stated, "I don't have [an] attorney right now." (*Id.* at 688.) This statement alone illuminates the circumstances in which Pouncy found himself and reveals Pouncy's state of mind when he decided to proceed *pro se*—he was being forced to represent himself because Breczinski was, in effect, not serving as counsel at all. Thus, the invocation of his right to represent himself was not the product of a voluntary choice, but instead was a coerced decision resulting from being deprived of any meaningful alternative.

The cases in which relief was not granted on a Hobson's Choice theory, by contrast, pose markedly different factual scenarios to the one presented here. For example, in *Akins v. Easterling*, 648 F.3d 380 (6th Cir. 2011), this Court rejected a petitioner's claim that he was forced to choose between representing himself and being represented by unprepared counsel because "the record does not show that his counsel was unprepared for trial." *Id.* at 397. Similarly, in *Wilks v. Israel*, 627 F.2d 32 (7th Cir. 1980), the petitioner was denied habeas relief on his Hobson's Choice claim because the "petitioner offered no explanation for his displeasure" with his appointed counsel. *Id.* at 36. In fact, in that case, there was "no indication that [counsel] was not a qualified attorney or that he was not conducting petitioner's defense in a capable manner," and instead, the petitioner's only objection to his counsel was that "he preferred to have an attorney he knew." *Id.* at 36 & n.4.

---

**2**Pouncy also was likely reticent to represent himself because, as he told the judge earlier, he had not been given any of the discovery materials to review prior to the trial.

Here, however, the record is replete with examples of Breczinski's unpreparedness. As discussed above, Breczinski had not obtained a final report from his investigator, to whom he had entrusted all the responsibility for interviewing witnesses, reviewing materials, and finding support for Pouncy's alibi defense. Breczinski also conspicuously failed to realize that some of the evidence presented by the prosecution could only weakly be traced back to Pouncy, and, when apprised of the actual basis for the evidence, still failed to argue against its admission. Therefore, it is apparent that Pouncy has made the required showing that he was forced to choose between unprepared counsel and representing himself, and thus, any waiver was constitutionally involuntary. Given the developed factual record detailing Breczinski's unpreparedness, as well as the clear statements Pouncy made indicating that he was representing himself because he did not have a functioning attorney, no fair-minded jurist could reach the conclusion that Pouncy was voluntarily choosing to represent himself. I would thus hold that the state court unreasonably applied the facts of this case in finding that Pouncy voluntarily waived his right to counsel.

Moreover, the state court's error cannot be excused under the doctrine of harmless error, inasmuch as a court commits structural error by accepting an invalid waiver of the right to counsel by a *pro se* defendant. *See Rose v. Clark*, 478 U.S. 570, 578 (1986) ("Harmless-error analysis . . . presupposes a trial, at which the defendant, *represented by counsel*, may present evidence and argument before an impartial judge and jury." (emphasis added)); *Cordova v. Baca*, 346 F.3d 924, 930 (9th Cir. 2003) ("[W]e conclude that if a criminal defendant is put on trial without counsel, and his right to counsel has not been effectively waived, he is entitled to an automatic reversal of the conviction."). In fact, in the *Faretta* context generally, harmless error review is inappropriate. *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984). Pouncy was thus not required to show any prejudice resulting from the trial court's acceptance of his invalid waiver. Instead, Pouncy was required to show only that the waiver of his right to counsel was involuntary, a task he has undoubtedly accomplished, thus entitling him to habeas relief.

The majority, in reversing the district court's judgment granting Pouncy habeas relief, holds that, in order for Pouncy to prevail, Breczinski's performance must amount to ineffective assistance as defined by *Strickland v. Washington*, 466 U.S. 668 (1984). Maj. Op. at 21–22.

Such a holding is patently incorrect for a few, key reasons. First, as every ineffective-assistance-of-counsel challenge makes clear, *Strickland* requires a petitioner to establish both that counsel's representation "fell below an objective standard of reasonableness," *id.* at 688, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. The second component, often referred to as the prejudice prong, does not belong in the analysis of a *Faretta* challenge, as the Supreme Court has specifically held that a *Faretta* violation is structural, meaning prejudice is not necessary to succeed on such a claim. *McKaskle*, 465 U.S. at 177 n.8; *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148–49 (2006) (including "the denial of the right of self-representation" within the class of cases that "'defy analysis by harmless-error standards' because they 'affec[t] the framework within which the trial proceeds,' and are not 'simply an error in the trial process itself.'" (alteration in original) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309–10 (1991)).

Second, the majority's importation of *Strickland* into a *Faretta* claim is based solely on the Seventh Circuit's opinion in *Wilks*, which states that "[a] defendant may not be forced to proceed with incompetent counsel; a choice between proceeding with incompetent counsel or no counsel is in essence no choice at all." Maj. Op. at 22 (citing *Wilks*, 627 F.2d at 36). Reliance on this decision is misplaced for a variety of reasons, including that the majority is adopting a standard enunciated not by the Supreme Court, but by a sister circuit whose decisions are not binding on us. AEDPA requires us to decide whether the state court unreasonably applied Supreme Court precedent, and not precedent from our own or any other circuit. *See* 28 U.S.C. § 2254(d); *Harrington*, 562 U.S. at 102. As the majority notes, there is no Supreme Court precedent importing the test for ineffective counsel, announced in *Strickland*, into the *Faretta* context. Maj. Op. at 22. Instead, the cases speak purely in terms of deciding whether a waiver of the right to counsel was knowing, intelligent, and voluntary. *See Tovar*, 541 U.S. at 88. The cases that *are* actually binding upon us, and which were decided post-AEDPA, strictly abide by this requirement and talk purely in terms of unpreparedness, not incompetence. In fact, the leading case on this issue from our Court, *James v. Brigano*, fails to use the word "competence," or any of its derivatives, even once in the entire opinion. *See also Akins*, 648 F.3d at 397 (holding that, "although Akins's letters reveal that he was worried about his counsel's preparation for trial, the record does not show that his counsel was unprepared for trial").

Therefore, in this context, the proper standard to address Pouncy's Hobson's Choice claim is counsel's unpreparedness, not his incompetence.

Third, while *Wilks* does talk in terms of a defendant being forced to proceed with incompetent counsel, at no point does *Wilks* equate "incompetent" with "ineffective," as defined by *Strickland*. In fact, when applying the "incompetence" standard to the facts in that case, the *Wilks* court focused only on whether the attorney was qualified and "conducting petitioner's defense in a capable manner," and not whether counsel's performance fell below an objective standard of reasonableness. *Wilks*, 627 F.2d at 36. Therefore, the case cannot be read to require that the petitioner demonstrate that his counsel was ineffective to the extent ordinarily required for claims of ineffective assistance of counsel. Thus, even if *Wilks* was binding on us, and consideration of its standards was allowed by AEDPA, it does not stand for the proposition that the majority imports upon it.

Finally, even if the majority is correct that Breczinski's unpreparedness was required to reach the level mandated for ineffective assistance of counsel claims, Pouncy would still be entitled to habeas relief based on Breczinski's clearly deficient performance. In the context of ineffective assistance of counsel claims, the Supreme Court has consistently held that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. Therefore, "[i]n assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).

In this case, we have a supposedly reasonable attorney stating on the record that he had not completed his investigation and that he needed to investigate further before confirming that he was ready for trial. This investigation was needed to substantiate Pouncy's alibi defense—the main defense that was to be used at trial—and therefore was of the utmost importance. Breczinski, however, delegated the entire investigation to his investigator and apparently made

no attempts to undertake any of the investigation himself. On the eve of trial, despite understanding the critical nature of the investigation, Breczinski only knew that his investigator had not delivered a "final report" and that the investigator had been ill for ten days, preventing him from finishing the investigation as of two weeks before trial. Notwithstanding this knowledge, or lack thereof, Breczinski seems to have made no timely effort to apprise himself of the status of the investigation or to find another investigator to complete the investigation before trial in the event that his original investigator was unwilling or unable to complete the task. Such a lack of oversight and preparation regarding an issue so central to the defense constitutes a dereliction of Breczinski's role as Pouncy's defense counsel, and clearly was not the product of a reasonable determination that further investigation was unnecessary.

As the record makes clear, Breczinski's failure to reasonably investigate Pouncy's defense constitutes performance below the objective standard required for effective assistance of counsel. *See Strickland*, 466 U.S. at 691. As a result, Pouncy's only two options were defending himself or having constitutionally-deficient counsel represent him. Being forced into such a choice rendered his invocation of his right to self-representation involuntary. Moreover, the result of the proceeding would likely have been different had the state trial court ruled in Pouncy's favor, as Pouncy clearly preferred all other outcomes to representing himself, as evidenced by his repeated requests for a continuance to allow Breczinski to better prepare for trial, for appointment of alternate counsel, and for leave to hire his own counsel. Thus, even if the standard announced by the majority was proper, Pouncy would still be entitled to habeas relief on his Hobson's Choice claim.

Because Pouncy was forced to choose between having Breczinski represent him, despite being unprepared to do so, and representing himself, Pouncy's waiver of his right to counsel and his invocation of his right to self-representation were not voluntary in the sense required by *Faretta*. In reaching the opposite conclusion, the state court failed to consider the testimony substantiating Pouncy's claim that Breczinski was woefully unprepared for trial and that, because of Breczinski's deficiency, Pouncy was forced to represent himself instead of being represented, in effect, by no lawyer at all. The state court's conclusion was unreasonable in light of the dictates of *Faretta* and *Tovar*.

I would therefore affirm the decision of the district court granting Pouncy habeas relief, and I respectfully dissent.