NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0236n.06

Case No. 21-1811

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
May 08, 2025
KELLY L. STEPHENS, Clerk

OMAR RASHAD POUNCY,                                    )
                                                      )
    Petitioner-Appellant/Cross-Appellee,          )
                                                      )
                                                      )     ON APPEAL FROM THE UNITED
v.                                                    )     STATES DISTRICT COURT FOR
                                                      )     THE EASTERN DISTRICT OF
CARMEN DENISE PALMER, Warden,                         )     MICHIGAN
                                                      )
    Respondent-Appellee/Cross-Appellant.          )     AMENDED OPINION

Before: SUTTON, Chief Judge; BOGGS and CLAY, Circuit Judges.

PER CURIAM.  In 2005, Omar Pouncy and several others committed a string of carjackings.  In 2006, a jury convicted him of violating several Michigan laws:  four counts of carjacking, four counts of armed robbery, two counts of carrying a firearm while committing a felony, and one count of being a felon in possession of a firearm.  In 2013, Pouncy filed a federal habeas action seeking his release.  In 2016, the district court granted the writ on the ground that Pouncy's invocation of his right to represent himself was not voluntary.  We reversed.  *Pouncy v. Palmer*, 846 F.3d 144, 147 (6th Cir. 2017).  In 2021, on remand, the district court granted the writ on another ground—that Pouncy's trial counsel (before Pouncy invoked the right to represent himself) acted ineffectively at the plea-bargaining stage.  The district court rejected the other claims and granted Pouncy a certificate of appealability on all of them.  We reverse the district court's ineffectiveness ruling and affirm its other decisions.

I.

Omar Pouncy has some familiarity with the Michigan courts. In January 2002, at age 14, Pouncy pleaded guilty to recklessly carrying a firearm. Pouncy served three months in a juvenile detention center before entering a juvenile justice diversion program in March 2003. While in that program, he sold drugs, tested positive for cocaine, and twice possessed a gun. The State placed him in various centers for delinquent minors until releasing him in October 2004.

Two months after his release, Michigan police arrested Pouncy for possessing cocaine, for possessing marijuana with the intent to distribute it, and for illegally carrying a concealed weapon. He was released on bond, but then arrested one week later for larceny. That March, he was arrested for delivering and possessing cocaine. The following month, he was arrested for assault with intent to do great bodily harm. Three weeks after that, he was arrested for carrying a concealed weapon. That August, Pouncy was sentenced to 278 days in prison and two years of probation for the concealed weapon charge and the December 2004 drug charges.

That brings us to the events that begin to underlie this case. While on probation for these earlier crimes, Pouncy and others committed four armed carjackings (on three occasions) in the fall of 2005 in and around Flint, Michigan. *Pouncy*, 846 F.3d at 147–48.

In the first carjacking, Pouncy targeted a Chevrolet Monte Carlo displayed for sale on Samuel Anderson's lawn in late September 2005. Pouncy asked about the price, and later met with the owner Ralph Haynes and Haynes's brother. After a test drive, Pouncy said that he would buy the car a few days later. Pouncy got the car, but he didn't buy it: When Pouncy returned for another test drive, he pulled a gun on Anderson and drove away with the vehicle.

The second carjacking proceeded in a similar way. That same day (or perhaps the next), Pouncy, his step-brother Wayne Grimes, and his friend Tiakawa Pierce entered Joseph Davis's

autobody shop. Pouncy, who identified himself as "Jacob Woods," expressed interest in purchasing a Chevrolet Camaro. Pouncy didn't offer to buy the car at that point. But he later called Davis and told him that he was "ready to make a deal." R.8-37 at 3. Davis called Earl Brady, the owner of the vehicle, and arranged for Brady to meet Pouncy at the shop. Brady arrived with his friend Patrick Wendell, and Pouncy arrived with Grimes and Pierce. Pouncy asked if he could take the car to his mechanic for an inspection. Brady agreed. At the planned address, Grimes pulled out a gun, demanded the Camaro keys, and shot into the air. Brady handed over the keys, Grimes stole Wendell's cell phone, and the two victims left the house on foot.

The third and fourth carjackings offer variations on the same theme. Pouncy called Thomas Sandstrom on October 10 to arrange for the inspection of a Cadillac that Sandstrom had advertised for sale in a local newspaper. The next day, Pouncy, Grimes, and Pierce arrived at Sandstrom's house, and Pouncy asked to take the car to his mechanic. Sandstrom agreed. Pouncy and Sandstrom drove in the Cadillac, Sandstrom's wife Maria drove in her Chevrolet Corvette, and Grimes drove Pierce in his Dodge Intrepid. After arriving at the mechanic's shop, Pouncy asked Sandstrom for the title to the Cadillac, which was in Maria's car. As Sandstrom turned to get it, Pouncy stuck a gun in Sandstrom's side. Pouncy ordered Maria to exit the Corvette, ordered Sandstrom to hand over his wallet, and ordered the two to walk into the woods. Grimes drove off in his car, leaving Pouncy and Pierce to drive away in the Sandstroms' Cadillac and Corvette. After the Sandstroms heard the cars drive away, they walked to the nearest road and flagged down a passing police car. Maria provided Grimes's license plate number to the police. *Pouncy*, 846 F.3d at 148. Officers arrested Grimes, who admitted to participating in the Brady and Sandstrom carjackings with Pouncy. *Id.* Officers arrested Pouncy on October 14.

3

Four days later, Pouncy pleaded no contest to the earlier assault charges, and in November he pleaded guilty to the March drug charges. The state court sentenced him to 24–60 months' incarceration for the assault charges and 13–48 months' incarceration for the drug charges. These convictions remain undisturbed as of this appeal.

Relevant today is Pouncy's role in the second and third carjacking incidents, which covered three cars. *Pouncy*, 846 F.3d at 148. As to these incidents, Pouncy was charged with several counts of carjacking, armed robbery, carrying a firearm while committing a felony, and being a felon in possession of a firearm.

The prelude to his trial on these charges and the trial itself led to several complications. In particular, as we explained in our prior opinion and with which we assume familiarity, Pouncy struggled with his defense counsel and with whether to represent himself. Over the trial court's firm warnings about the risks of self-representation, Pouncy invoked his constitutional right to represent himself in the midst of the trial. Pouncy's counsel remained as standby counsel. Pouncy's self-representation did not go well. After a six-day trial, the jury convicted him on four counts of carjacking, four counts of armed robbery, two counts of carrying a firearm while committing a felony, and one count of being a felon in possession of a firearm.

The court sentenced him to 562 months for the Brady and Sandstrom carjackings and armed robberies, and 24 months for the felony firearm convictions. In sentencing him at the top of the range, the trial court noted that it had "[n]ever seen this. Someone that's so arrogant and so manipulative, and doesn't have a problem with humiliating people." R.8-16 at 74. It explained that Pouncy had "shown no remorse whatsoever," and it remarked that it was "shocked by" Pouncy's extensive criminal history for an eighteen-year-old. R.8-16 at 77.

4

(As for the first carjacking, the trial court convicted Pouncy, after a bench trial, of one count of carjacking, armed robbery, felony firearm use, felon in possession, and carrying a concealed weapon. *People v. Pouncy*, Nos. 269298, 270604, 2008 WL 9869818, at *4 (Mich. Ct. App. Mar. 25, 2008). It sentenced him to 450–900 months, but the Michigan Court of Appeals reversed the conviction. *Id.* at *1. After securing convictions for the second and third carjacking incidents, the State voluntarily dismissed the charges for the first carjacking.)

Over the next seven years, Pouncy (with the help of new counsel) filed a direct appeal from his remaining carjacking convictions and several motions for collateral relief. The Michigan courts rejected Pouncy's direct appeals and requests for postconviction relief. *People v. Pouncy*, Nos. 269298, 270604, 2007 WL 4548111 (Mich. Ct. App. Dec. 27, 2007) (direct appeal); *Pouncy*, 2008 WL 9869818 (reconsideration of direct appeal); *People v. Pouncy*, 753 N.W.2d 187 (Mich. 2008); *People v. Pouncy*, No. 17154 (Mich. 7th Cir. Ct. Nov. 4, 2010) (motion for rehearing); *People v. Pouncy*, No. 306257 (Mich. Ct. App. July 13, 2012) (postconviction appeal); *People v. Pouncy*, 830 N.W.2d 387 (Mich. 2013).

In 2013, Pouncy filed a petition in federal court to obtain habeas relief. The district court granted the writ on the ground that Pouncy invoked his right to counsel involuntarily. *See Pouncy v. Palmer*, 165 F. Supp. 3d 615, 631 (E.D. Mich. 2016). It released Pouncy pending the State's appeal. *Pouncy v. Palmer*, 993 F.3d 461, 463 (6th Cir. 2021). One month after his release, Pouncy tried to enter the chambers of the state court judge who presided over his original criminal trial. *Id.* Soon after, Michigan charged him with illegally owning a firearm and ammunition as a felon. *Id.* Pouncy pleaded no contest to these charges, and the Michigan trial court sentenced him to a term of work release. The federal district court then revoked Pouncy's bail and returned him to prison for violating the terms of his release.

5

Meanwhile, we reversed the district court's grant of habeas corpus. *Pouncy*, 846 F.3d at 163. We rejected Pouncy's argument that his waiver of counsel was ineffective because the trial court forced him into a "Hobson's choice" of proceeding with unprepared counsel or proceeding alone. *Id.* We remanded the case.

Pouncy's first strategy on remand—that he was actually innocent of the crimes—did not work. His counsel proffered two affidavits, one from a man named Jaakawa McGruder who admitted responsibility for the crimes, and another from a witness named Willie Joyce who allegedly identified McGruder in an earlier photo lineup as the ringleader, not Pouncy. At an evidentiary hearing, McGruder testified in detail about how he perpetrated the carjackings, telling the district court that he committed each one without Pouncy. Joyce also testified that he believed the man he identified was McGruder, not Pouncy.

Two problems undermined this defense. McGruder was in jail during one of the carjackings, making it implausible that he committed that one. And a prison officer discovered a phone revealing several incriminating messages between Pouncy and McGruder. *Pouncy*, 993 F.3d at 463. Pouncy texted McGruder: "We need 2 stick 2 the plan . . . going 2 showu the $ the day of court . . . wen u get off the stand . . . . I'm not giving up no 10k for nothing." R.238-2 at 6. "And i gave u that 5k as a down payment 4 for testifying . . . ." R.238-2 at 6. After McGruder expressed concern about his ignorance of the details, Pouncy texted him over 600 words detailing the events of each carjacking, including details of the scheme, victims, and vehicles. McGruder texted back, asking Pouncy to clarify whether he "was driving the white car," to which Pouncy responded, "Cadillac yes." R.238-2 at 9.

These revelations put a damper on this defense strategy. Two law firms representing Pouncy moved to limit their representation to Pouncy's claims unrelated to actual innocence. Several other attorneys withdrew.

The State moved to dismiss Pouncy's entire petition given his subornation of perjury, but the district court declined, viewing it as too severe a sanction. The district court suggested that Pouncy should abandon his procedurally defaulted claims, rather than contest the allegations against him, which Pouncy accepted. It then referred the State's allegations to the United States Attorney for the Eastern District of Michigan to decide whether to seek federal criminal charges against Pouncy. A federal grand jury indicted Pouncy for one count of conspiracy to obstruct justice, suborn perjury, and commit perjury, 18 U.S.C. § 371, one count of conspiracy to tamper with a witness, *id.* § 1512(k), one count of tampering with a witness, *id.* § 1512(b)(1), one count of paying a bribe to a witness, *id.* § 201(b)(3), and three counts of suborning perjury, *id.* § 1622. Indictment at 15–22, *United States v. Pouncy*, No. 4:23-cr-20262-SDK-CI-1 (E.D. Mich. May 3, 2023).

That led to Pouncy's second strategy on remand: to claim ineffective assistance. The district court granted the writ on the ground that Pouncy's trial counsel failed to provide effective assistance during the plea-bargaining stage of the case. *Pouncy v. Macauley*, 546 F. Supp. 3d 565, 573 (E.D. Mich. June 28, 2021). It denied relief on the other grounds and granted a certificate for appellate review on each of them. *Id.* The State appealed the ineffectiveness claim, and Pouncy appealed the certified claims.

One preliminary note. By our count, Pouncy has had 32 lawyers over the last 19 years in this proceeding alone. Pouncy fired some. Others withdrew. His current counsel—Sophia L. Cai of Jenner & Block, Raymond A. Cardozo of Reed Smith, and Gabriel Gillett of Jenner &

7

Block—have filed excellent briefs on appeal and have now moved to withdraw in view of their client's propensity to file motions on his own without consulting counsel. Having benefited from the briefing provided by these lawyers, we now grant their motions to withdraw.

II.

The Antiterrorism and Effective Death Penalty Act of 1996 prohibits federal courts from granting a writ of habeas corpus for claims "adjudicated on the merits" in state court unless the state court's resolution of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). This familiar language "sharply limits" our review of state court judgments that resolve claims on the merits. *Johnson v. Williams*, 568 U.S. 289, 298 (2013). We may reverse such a state court decision only if it is inconsistent with a Supreme Court case that contains "materially indistinguishable facts," *Williams v. Taylor*, 529 U.S. 362, 413 (2000), if the state court decision is so unreasonable that all "fairminded jurists" would recognize the error, *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation omitted), or if the state court decision turns on clearly unreasonable state court fact-finding, *Burt v. Titlow*, 571 U.S. 12, 18 (2013). Otherwise, if the state courts did not address the merits of a claim, we give it fresh review.

A.

*Ineffective assistance of trial counsel.* At issue is whether Pouncy's lawyer violated his Sixth Amendment right to counsel by providing him ineffective assistance in the course of his decision to reject the prosecution's plea offer. The claim turns on the answer to two questions. Did counsel's performance fall below "an objective standard of reasonableness"? And was Pouncy

8

prejudiced as a result? *Strickland v. Washington*, 466 U.S. 668, 688 (1984). In determining prejudice in the context of a plea bargain, we ask three questions: Would the defendant have accepted the government's plea deal? Would the court have accepted its terms? And would this sentence be shorter than that imposed at trial? *Griffin v. United States*, 330 F.3d 733, 739 (6th Cir. 2003); *Smith v. United States*, 348 F.3d 545, 552–54 (6th Cir. 2003); *see Lafler v. Cooper*, 566 U.S. 156, 164 (2012).

To determine whether the Michigan courts addressed this claim on the merits, we must search for "the last reasoned decision." *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991). On state postconviction review, the Michigan Court of Appeals determined that Pouncy failed to "meet the burden of establishing entitlement to relief under MCR 6.508(D)," *People v. Pouncy*, No. 306257 (Mich. Ct. App. July 13, 2012), and the Michigan Supreme Court refused to review the decision, *Pouncy*, 830 N.W.2d at 387. Such "unexplained orders" require us to "look[] through" to an earlier opinion. *Ylst*, 501 U.S. at 804; *see Guilmette v. Howes*, 624 F.3d 286, 289–91 (6th Cir. 2010) (en banc).

On postconviction review, the Michigan trial court, assessing Pouncy's claim that counsel was generally ineffective and specifically ineffective as to the plea bargain, concluded that "the Michigan Court of Appeals specifically held otherwise." R.8-37 at 23–24. The trial court held that it "may not grant relief pursuant to MCR 6.508(D)" because "the Court of Appeals has previously decided this issue against" Pouncy. R.8-37 at 23. When Michigan's postconviction courts decline review under this collateral estoppel rule, we "'look through' to the prior judgment creating the *res judicata* effect." *Stokes v. Scutt*, 527 F. App'x 358, 365 (6th Cir. 2013); *see Key v. Rapelje*, 634 F. App'x 141, 145 (6th Cir. 2015). And we consider this review of the prior

9

judgment under Michigan's collateral estoppel rule to be an adjudication on the merits. *Amos v. Renico*, 683 F.3d 720, 727–28 & n.2 (6th Cir. 2012).

The Michigan Court of Appeals rejected all of Pouncy's theories of ineffectiveness on the merits, concluding that "Defendant was not deprived of the effective assistance of counsel." *Pouncy*, 2008 WL 9869818, at *19–21. That court did not expressly outline its reasons for rejecting Pouncy's theory of plea-bargaining ineffectiveness, as it did for some of the other claims. But the claim was before the Michigan Court of Appeals (it did not, for instance, reject his pro se brief), and indeed the court expressly addressed several other claims that Pouncy raised in that brief. *Id.* at *27. Under settled principles, we presume that a state court adjudicates each claim presented to it, even if it does so "without expressly addressing that claim." *Johnson*, 568 U.S. at 301; *Richter*, 562 U.S. at 99; *Stermer v. Warren*, 959 F.3d 704, 723 (6th Cir. 2020). The state postconviction court also construed the Michigan Court of Appeals' decision as resolving this claim, noting that it rejected the ineffectiveness claim even if "the distinct issues presented" were "not specifically . . . ruled on by the Court of Appeals." R.8-37 at 23–24; *see Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005).

Because the state courts addressed Pouncy's claim on the merits, AEDPA limits our review. The state court reasonably applied federal law when it rejected Pouncy's ineffectiveness claim. Indeed, with or without AEDPA, and with or without an evidentiary hearing, this claim fails because Pouncy has not shown that his counsel performed unreasonably or that his counsel's performance prejudiced him.

*Performance.* At the plea bargaining stage, defense counsel must provide their clients with "professional guidance" sufficient for them to "make an intelligent decision about whether to accept a plea offer." *Smith v. United States*, 348 F.3d 545, 553–54 (6th Cir. 2003) (quotation

omitted).  Counsel must ensure their clients know of the terms of each formal plea deal, *Missouri v. Frye*, 566 U.S. 134, 145 (2012), and have some idea of their "sentence exposure" if they proceed to trial, *Smith*, 348 F.3d at 553 (quotation omitted).  We have not outlined a definitive "checklist" identifying exactly what counsel must tell their clients to satisfy this requirement.  *Strickland*, 466 U.S. at 688.  We ask whether counsel's "acts or omissions" were reasonable in view of "all the circumstances," *id.* at 690, and whether the defendant has countered the "strong presumption" that counsel acted "within the wide range of reasonable professional assistance," *Richter*, 562 U.S. at 104 (quotation omitted).

At the same time, we must be mindful that it is "all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court" to find it unreasonable after the fact.  *Strickland*, 466 U.S. at 689.  That's particularly true in the context of plea deals, where it's easy to have "second thoughts" after a conviction and a longer sentence.  *See United States v. Crowe*, No. 22-6046, 2023 WL 4586154, at *3 (6th Cir. July 18, 2023).

With or without AEDPA deference, Pouncy's counsel cleared this modest bar.  Michigan courts impose sentences as a range, with minimum and maximum terms of incarceration.  During Pouncy's sentencing, state courts had to set the minimum term within the calculated guidelines range.  *People v. Babcock*, 666 N.W.2d 231, 236 n.7 (Mich. 2003).  Once a defendant had served that minimum sentence, the Michigan Parole Board could have released him before the maximum term.  Mich. Comp. Laws § 791.234(1).  Statutes usually governed the maximum sentence, but a court could have set it lower for counts that carry life sentences.  *People v. Moore*, 417 N.W.2d 508, 513–15 (Mich. Ct. App. 1987).

11

Counsel's statements during trial, as we said during the last appeal, made clear that he had "read all of the materials in Pouncy's file" before trial. *Pouncy*, 846 F.3d at 162. At that point, counsel and the prosecutor "together" determined a likely guidelines range as part of plea negotiations. R.8-7 at 20–21. They agreed on a likely range of 135–337 months without the firearm charges if Pouncy advanced to trial.

The district court and the State speculated (and we will presume) that they reached this range by assuming that Pouncy would be sentenced for a Class "A" felony, with a prior record variable of "E," an offense-variable level of IV (based on 75 offense-level points), and a third-level habitual offender status. This corresponds to a 135–337-month guidelines range, again without the firearms charge. Mich. Comp. Laws § 777.21(3)(a)–(c).

Pouncy's counsel and the prosecutor estimated that, if Pouncy accepted the plea agreement, he would have a likely range of 135–225 months without the firearm charges. More specifically, the plea deal would have dropped the "habitual offender" designation on the four counts of carjacking. R.8-7 at 21–22. That designation enhances the guidelines range maximum depending on the number of prior felony convictions. Mich. Comp. Laws § 777.21(3). For Pouncy (a third habitual offender) that designation would have increased his maximum sentence by 50%. *Id.* § 777.21(3)(b). From the outset, all agreed that Pouncy faced potential maximum sentences of life if found guilty of any of the carjacking or armed robbery charges.

Before trial, counsel informed the trial judge of the minimum and maximum guidelines ranges, which the court relayed to Pouncy. The trial court also informed Pouncy that several charges carried a potential life sentence. The trial court noted that there was not much difference between the guidelines ranges, so it could "see why [Pouncy] might want to go to trial." R.8-7 at

22. It then allowed Pouncy time to speak to counsel. Returning to the courtroom, Pouncy told the trial court, "I will never take the plea to nothin' I did 'cause I didn't do it." R.8-7 at 23.

At sentencing, some of counsel's predictions about various offense variables proved correct. Counsel objected to and eliminated enhancements for negligence and threats to court security. Counsel also objected to and reduced an enhancement for aggravated use of a weapon from 25 points to 15 points.

But some of the prosecutor's and counsel's (and the judge's) predictions did not anticipate the events of trial, perhaps because at the plea-bargaining stage no one assumed that Pouncy would represent himself. Recall that Pouncy did not fire his attorney until the trial had already begun. The prosecutor and counsel (and judge) apparently did not anticipate that other variables would come into play: psychological injury to a victim and holding a victim captive beyond the time necessary to commit the crime, adding 35 points. The first adjustment occurred because one of the victims testified that she was terrorized. *See People v. White*, 905 N.W.2d 228, 228 (Mich. 2017) (per curiam). The second adjustment occurred because evidence at trial revealed that Pouncy ordered the Sandstroms into the woods by gunpoint, holding them captive for longer than necessary to steal their cars.

All of this led to a 225–562-month minimum-sentence guidelines range for the carjackings and armed robberies. The court imposed a 562–800-month sentence plus 24 consecutive months for the firearms charges. It imposed this sentence at the top of the guidelines range in part based on Pouncy's courtroom behavior and his lack of remorse.

On this record, Pouncy's counsel satisfied the requirements of the Sixth Amendment— again with or without AEDPA deference. Counsel provided enough information for Pouncy to make an intelligent decision about declining the plea deal, and he had no reason to anticipate that

13

Pouncy would represent himself and that some of the sentencing enhancements would flow from that decision.

Pouncy had the key information to "make an intelligent decision about whether to accept a plea offer." *Smith*, 348 F.3d at 554. At the time that Pouncy declined the plea deal, he understood the basic terms of the plea deal, the maximum sentence he faced on each of the charges, and his counsel's (and the prosecution's) "best guess calculation" of his minimum sentence at trial based on some of these charges. R.371 at 91. Notably, neither the counsel nor the prosecutor said this range was set in stone or that it could not change based on the evidence presented at trial. At no point did anybody say that this range was anything but an estimate. And at no point did the judge—the same judge who later sentenced Pouncy—second-guess this estimation, again because no one anticipated at that point that Pouncy would represent himself. This information sufficed to allow Pouncy to make an informed decision about whether he should take the plea deal or risk a maximum life sentence.

Nor do the sentencing estimates rebut our "strong presumption" that counsel acted reasonably. *Strickland*, 466 U.S. at 689. Predicting a guidelines range is often "more art than science." *United States v. Anonymous Defendant*, 629 F.3d 68, 78 (1st Cir. 2010). In federal sentencing, other courts have recognized the reality that competent attorneys can overlook even "plainly obvious" enhancements without being constitutionally deficient. *United States v. Valdez*, 973 F.3d 396, 404 & n.4 (5th Cir. 2020); *see Bethel v. United States*, 458 F.3d 711, 717 (7th Cir. 2006). Proving the difficulty of making predictions in this area, counsel and the prosecutor both decided against including each offense variable—there are 20—in the guidelines range during plea negotiations. *See* Mich. Comp. Laws § 777.22. That was not for lack of experience. At the time, this prosecutor had four or five years of experience, handling 20 to 40 cases per month. And the

14

prosecutor described defense counsel as "a very experienced lawyer that [he] had dealt with a lot before." R.371 at 47, 110–11.

Add to this a key contextual feature of the proceedings. It is sometimes the case during plea bargaining that the parties know that a defendant will represent himself at trial—say when standby counsel has been appointed and engages in the plea negotiations or when a pro se defendant personally negotiates with the prosecution. *See, e.g.*, *United States v. Mamoth*, 47 F.4th 394, 401 (5th Cir. 2022); *United States v. Cohen*, 888 F.3d 667, 675 (4th Cir. 2018). The same was not true for Pouncy. At the time, Pouncy had counsel, whom everyone assumed would represent Pouncy at trial. At no point did Pouncy ask the court about the possible implications of self-representation on the estimated sentence ranges. Neither Pouncy's counsel nor the trial court can be faulted for not anticipating Pouncy's about-face decision to represent himself in the middle of trial—or the effects it might have on his defense and ultimate sentence.

Take one example to illustrate the point. The trial court sentenced Pouncy to "the top of the guidelines" range due to its fears that Pouncy might "come in and make a mockery of the court system again." R.8-16 at 81. It noted that he "humiliated his lawyer," and "humiliated his step-brother . . . on the witness stand[ and] on cross-examination." R.8-16 at 74. It noted how, during cross-examination, Pouncy "cross-examine[d] his step-brother about Mr. Pouncy having a sexual relationship with some girlfriend." R.8-16 at 74. And it noted how he "terrorize[d] Ms. Sandstrom even further" and "terrorized her husband." R.8-16 at 75. At the time of the guidelines estimate, nobody but Pouncy could have expected that he would represent himself and terrorize the witnesses. Baseline competence under the Sixth Amendment does not require clairvoyance.

Pouncy argues that the State forfeited its claim that AEDPA deference applies before the district court. But the district court did not apply forfeiture. Generally speaking, at any rate,

standards of review are not for parties to forfeit or waive. As a habeas court, we must independently determine when AEDPA applies. *Brown v. Romanowski*, 845 F.3d 703, 711 n.4 (6th Cir. 2017).

Pouncy argues that the extent of the sentencing disparity between the pre-trial estimate and his final sentence shows that his counsel was deficient. But the gap between the plea-level predictions as to a minimum sentence and the final sentence does not establish deficiency by itself, particularly when the sudden appearance of self-representation is added to the mix. *See, e.g.*, *Valdez*, 973 F.3d at 404; *Mix v. Robinson*, 64 F. App'x 952, 956 (6th Cir. 2003); *United States v. Arvanitis*, 902 F.2d 489, 494 (7th Cir. 1990); *Thomas v. United States*, 27 F.3d 321, 325–26 (8th Cir. 1994); *Doganiere v. United States*, 914 F.2d 165, 168 (9th Cir. 1990); *United States v. Gordon*, 4 F.3d 1567, 1570–71 (10th Cir. 1993); *Riolo v. United States*, 38 F.4th 956, 974 (11th Cir. 2022). That is particularly so when Michigan law allows a maximum life sentence for a conviction on any one of several counts, even barring any enhancements. Even the most competent attorney, moreover, can underestimate a defendant's exposure by considerable margins. *See Riolo*, 38 F.4th at 974. This is all the more true when predicting a defendant's final sentence, which frequently hinges on developments at trial, including the testimony of the witnesses—victims among them. *Pouncy*, 846 F.3d at 163.

Pouncy argues that counsel needed to alert him of the "worst-case scenario of rejecting the plea offer." *United States v. Knight*, 981 F.3d 1095, 1102 (D.C. Cir. 2020); *see Julian v. Bartley*, 495 F.3d 487, 498–500 (7th Cir. 2007). But the trial court did just that. It informed Pouncy of the worst-case scenario—a potential life sentence—before Pouncy rejected the offer. It told Pouncy that "the carjacking carries life, in fact all of the carjacking offenses carry life, armed robbery

carries life of course, felony firearm is two years consecutive . . . and then he's got carjacking which again is a life offense." R.8-7 at 19.

Pouncy faults counsel for failing to clarify that his guidelines range was an estimate that could change based on what occurred at trial. But counsel never said that these ranges were the only possibilities. Why else would the trial court remind him of the possibility of a life sentence? At all events, there are no "mechanical rules on counsel," *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000), which explains why there is no need to use the word "estimate" or its equivalent in advising a client. In context, it was plain that the prosecutor, counsel, and judge were all talking predictions. No "formula or script" or magic words accompany such advice in every case. *Iowa v. Tovar*, 541 U.S. 77, 88 (2004).

*Prejudice.* Even if counsel's advice and predictions amounted to unconstitutional representation, Pouncy cannot show prejudice. Pouncy cannot establish a "reasonable probability" that better advice from his counsel would have led to a shorter sentence because all of the contemporaneous evidence confirms that Pouncy would not have taken a plea deal. That is true whether AEDPA deference applies or not.

Petitioners seeking to undo their plea decisions through "*post hoc* assertions" must verify these assertions with "contemporaneous evidence." *Lee v. United States*, 582 U.S. 357, 369 (2017). That evidence confirms that Pouncy would *not* have taken any deal. One year before trial in January 2005, Pouncy wrote to the prosecutor that he was "not trying to get no plea or nothing to [sic] that sort." R.387 at 1–8. It bears repeating that Pouncy told the state court one year later at trial that he would "never take the plea to nothin' [he] did 'cause [he] didn't do it." R.8-7 at 23. Throughout the trial, direct appeal, postconviction proceedings, and the first phase of the federal habeas corpus review, Pouncy instead mainly focused on proving his actual innocence.

17

The evidentiary hearing does not alter this conclusion. We view new statements made years later in evidentiary hearings with a great deal of skepticism. *Lee*, 582 U.S. at 368–69; *see Rosencrantz v. Lafler*, 568 F.3d 577, 585 & n.5 (6th Cir. 2009). This evidentiary hearing deserves particular skepticism. It took place in January 2021, fifteen years after the plea hearing and sixteen years after Pouncy's letter to the prosecutor. Pouncy spent most of that time incarcerated. *Pouncy*, 993 F.3d at 463. Pouncy's trial counsel, a key witness in any ineffective-assistance claim, had died by then. And the habeas proceedings were marred by significant evidence of Pouncy tampering with a witness, conspiring to suborn perjury, paying a bribe to a witness, and thrice suborning perjury. These very efforts led to the withdrawal of Pouncy's appellate counsel. And Pouncy's prejudice theory required believing that he lied to the prosecutor in 2005, perjured himself before the state trial court in 2006, but credibly and truthfully testified in the 2021 proceedings (despite his alleged attempts to suborn the perjury of others in those same proceedings). When directly asked if he was perjuring himself in this very proceeding, Pouncy pleaded the right not to incriminate himself under the Fifth Amendment. We can take an adverse inference from his invocation of this right in the civil context of this habeas proceeding and fairly question his truthfulness. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976).

Nor do the district court's findings change matters. Prejudice is not dictated by factfinding. A district court cannot transform a fair conviction into an unfair one through "findings of fact" that purport to answer a legal question. We have rejected such attempts before in this same case, declining to defer to district court inferences based on state-court records. *Pouncy*, 846 F.3d at 159 ("[W]e give plenary review to any such findings that are based on the district court's review of state-court record."); *see, e.g.*, *Smith v. Sharp*, 935 F.3d 1064, 1072 (10th Cir. 2019); *Randolph v. Sec'y Pa. Dep't of Corr.*, 5 F.4th 362, 372 (3d Cir. 2021). The same is true when a defendant's

statements amount to an "unreliable metric of reasonably probable outcomes," say when "a defendant's *post hoc* assertions" are at odds with "contemporaneous evidence." *Byrd v. Skipper*, 940 F.3d 248, 258–59 (6th Cir. 2019) (quoting *Lee*, 582 U.S. at 367–68).

All in all, no cognizable Sixth Amendment violation occurred with respect to the plea negotiations. And that, to repeat, is true whether we apply AEDPA deference or not.

B.

*Involuntary waiver of counsel.* Pouncy claims that the state trial court failed to inform him about the dangers of self-representation. The Michigan Court of Appeals rejected this claim on the merits. It explained that the "trial court properly apprised" Pouncy of these dangers when it told him that he would be a "fool" if he represented himself, warned him that he would be treated "like any other lawyer," and explained that he would need to comply with complicated court procedures, including "objections and everything else." *Pouncy*, 2008 WL 9869818, at *9. The Michigan Court of Appeals then "conclude[d] that the trial court properly apprised [Pouncy] of the risks associated with self-representation." *Id.*

That decision does not clearly violate any decisions by the U.S. Supreme Court. The relevant decisions state a general rule: that the defendant must "be made aware of the dangers and disadvantages of self-representation," *Faretta v. California*, 422 U.S. 806, 835 (1975), a task that "depend[s] on a range of case-specific factors," *Tovar*, 541 U.S. at 88. The benchmark is whether the defendant "knows what he is doing and his choice is made with eyes open." *Faretta*, 422 U.S. at 835 (quotation omitted). The "more general" a rule, the more room there is for state courts to implement it without violating clearly established law. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

The trial court's inquiry respects these principles—and more. In addition to the above warnings, the trial court told Pouncy that he "ha[d] no business representing [him]self, none whatsoever," R.8-7 at 234, and that, if it were in his position, it "would let [counsel] represent me in a heartbeat before I would represent myself with the knowledge that you have," R.8-7 at 218. The trial judge's warnings put Pouncy on notice of the risks of self-representation, and the state appellate court's affirmance of this approach does not offend clearly established law.

Trying to head off this conclusion, Pouncy faults the state court for failing to require an express and unequivocal waiver from him. But it did just that. The court acknowledged that "the waiver request must be unequivocal" and that the trial court must "indulge[] every reasonable presumption against waiver." *Pouncy*, 2008 WL 9869818, at *5 (quotation omitted). The trial court asked Pouncy, "Is that your desire at this time," later adding, "You're gonna be representing yourself from beginning to end sir. Is that what you really want to do," to which Pouncy responded, "Yes. Yes." R.8-7 at 233–34. The Michigan Court of Appeals did not unreasonably apply the law when it concluded that the trial court obtained an unequivocal waiver.

Pouncy adds that *Von Moltke v. Gillies* required the trial court to advise him of "the nature of the charges" against him and the "range of allowable punishments thereunder." 332 U.S. 708, 724 (1948) (plurality op.). But that case differs materially from this one. It dealt with the separate issue of the waiver of counsel when taking a guilty plea, not the waiver of counsel at trial. *See Nevada v. Jackson*, 569 U.S. 505, 512 (2013) (per curiam); *Taylor*, 529 U.S. at 413. Since then, the Supreme Court has rejected the notion that the trial court needs to follow "any formula or script." *Tovar*, 541 U.S. at 88. What matters is notice of the risks of self-representation. The trial court satisfied that duty when it discussed Pouncy's understanding of the law, the seriousness of the charges, and the downsides of self-representation.

Pouncy insists that the state court unreasonably applied the law because it deemed his waiver invalid when it came to the first trial (over the initial carjacking) but not when it came to the separate trial over the second and third carjackings. But it's not unusual to have different cases that lead to different conclusions. In the trial for the first carjacking, "the trial court never directly asked [Pouncy], nor did he directly state, whether he wished to represent himself." *Pouncy*, 2008 WL 9869818, at *30. During the later trial over the second and third carjackings, Pouncy made his request clear, and the trial court carefully warned him about that choice.

Pouncy on his own argues that the Michigan Court of Appeals decision reflected an unreasonable determination of the facts, and that we should overturn his conviction because the district court did not address this claim. Pouncy contends that he did not waive his right to counsel when he "repeatedly insist[ed] on the appointment of substitute counsel," *id.* at *8, and that the trial court did not "repeatedly advise[] [the] defendant of the charges against him," *id.* at *9. But Pouncy did not "repeatedly insist" on substitute counsel. After his initial request, Pouncy expressly stated his desire to proceed without counsel. Nothing required the trial court to advise Pouncy again of the specific charges against him. *Glass v. Pineda*, 635 F. App'x 207, 214–15 (6th Cir. 2015); *see Akins v. Easterling*, 648 F.3d 380, 398 (6th Cir. 2011). We thus cannot say that either fact determination presented an error "clear" or "convincing" enough to overturn the state court's fact determination. *Burt*, 571 U.S. at 18. And any error that the district court made in failing to address this argument is harmless anyway.

C.

*Right to substitute counsel.* Pouncy claims that the state trial court violated the Sixth Amendment by denying his motion to substitute counsel in the middle of trial—before he invoked his right to represent himself.

21

The Michigan Court of Appeals rejected this claim on the merits. It explained that "the right of a defendant to choose his own retained counsel . . . is not absolute" and that "a court must balance the defendant's right to choice of counsel against the public's interest in the prompt and efficient administration of justice." *Pouncy*, 2008 WL 9869818, at \*11. The court noted that Pouncy "did not make a formal motion for a continuance," and that, even if he did, "the trial court did not abuse its discretion in denying the request." *Id.* It further noted that Pouncy failed to show that counsel did "not provid[e] him with effective assistance" and that his "purported request did not come until trial was already underway and after he had already expressed a desire to represent himself." *Id.* AEDPA deference thus applies to this decision.

Four considerations guide review of denied motions for substitute counsel: (1) the motion's timeliness, (2) the thoroughness of the state court's inquiry, (3) the conflict between the petitioner and his lawyer, and (4) the public interest in speedy trials. *Henness v. Bagley*, 644 F.3d 308, 321 (6th Cir. 2011); *see Chandler v. Fretag*, 348 U.S. 3, 10 (1954). In considering these factors, courts may "rel[y] on instinct and judgment based on experience." *Wheat v. United States*, 486 U.S. 153, 163 (1988). A trial court has "wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 152 (2008). Only unreasoned "insistence upon expeditiousness in the face of a justifiable request for delay" will violate the right to retain counsel. *Morris v. Slappy*, 461 U.S. 1, 11–12 (1983) (quotation omitted).

All four factors weigh against Pouncy's claim. As to timeliness, we have deemed tardy a request to substitute counsel "one and a half months" before trial. *United States v. Chambers*, 441 F.3d 438, 447 (6th Cir. 2006). We have held the same for a substitution request "made a week prior to the original trial date" and renewed "two weeks before the rescheduled trial date." *United*

22

*States v. Vasquez*, 560 F.3d 461, 467 (6th Cir. 2009). In this instance, Pouncy first raised the prospect of retaining new counsel after the trial had started. Replacing counsel at that point would have incurred substantial delays as new counsel faced the imperatives of learning the record and meeting with his client. At such a late stage, "the trial judge's actions are entitled to extraordinary deference." *Id.* This factor strongly favors the State.

The trial court's careful inquiry in identifying the nature of the conflict also favors the State. *United States v. Marrero*, 651 F.3d 453, 465 (6th Cir. 2011). The trial court began by allowing Pouncy a chance to "explain his concerns." *Id.* (quotation omitted). It listened to Pouncy describe how he was "really not on the same page" with counsel. R.8-7 at 5. Pouncy complained that counsel neglected to file pre-trial motions, ignored issues that he raised regarding the police reports, and deprived him of discovery. The trial court then "allowed counsel to respond." *Marrero*, 651 F.3d at 465 (quotation omitted). Only then did it proceed with the trial.

The minimal nature of the conflict also weighs against Pouncy. We consider whether the conflict "resulted in a total lack of communication preventing an adequate defense." *Vasquez*, 560 F.3d at 466 (quotation omitted). Pouncy estimates that he met with counsel a "dozen" times. *Pouncy*, 846 F.3d at 162. When they discussed his alibi, counsel hired an investigator. *Id.* These facts belie any notion that an alleged conflict resulted in a complete lack of communication between Pouncy and his lawyer.

The public equities also weigh against Pouncy. In this case, his late request would "almost certainly necessitate a last-minute continuance," *Vasquez*, 560 F.3d at 468 (quotation omitted), as he requested new counsel *during the trial*. On this record, no Sixth Amendment violation occurred—with or without AEDPA deference.

23

Pouncy insists that timeliness favors him because he requested new counsel the morning before trial. But that did not happen. Pouncy expressed *dissatisfaction* with his court-appointed counsel the morning before trial, not a desire to hire retained counsel. These complaints about his appointed counsel do not qualify as a request for new counsel, which he did not make until the trial had begun.

Pouncy argues that the trial court should have told him about his right to hire his own counsel, pointing to *United States v. Chapple*, 801 F. App'x 379, 381 (6th Cir. 2020). But the case does not help him. It involved a violation of the Federal Rules of Criminal Procedure, not a violation of the Sixth Amendment. *Id.* Federal procedural rules do not apply to state court proceedings.

Pouncy points to the district court's conclusion that the attorney-client conflict favors him because of their "fractured relationship." Second Br. 61 (quotation omitted). But this factor requires more than a "fractured relationship"; it requires a "total lack of communication preventing an adequate defense" or "complete breakdown in communication." *Henness*, 644 F.3d at 321 (quotation omitted). True, as the district court recognized, counsel's failure "to understand the defense that Pouncy wished to present" is troubling. R.401 at 31. But that is different from a complete breakdown of their relationship that results in an inadequate defense.

D.

*Constructive denial of counsel.* Pouncy claims that the trial court constructively denied him counsel during the pretrial stage of the case. While the claim appears to be procedurally defaulted because Pouncy did not raise it in state court, *see Coleman v. Thompson*, 501 U.S. 722, 749–53 (1991), it fails on the merits anyway.

24

A constructive denial of counsel claim permits a court to presume prejudice if a litigant shows that his counsel failed to attend "a critical stage" of the proceedings, "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing," or lacked the experience necessary to try a complex case. *Bell v. Cone*, 535 U.S. 685, 695–96 (2002) (quoting *United States v. Cronic*, 466 U.S. 648, 659, 662 (1984)). Pouncy cannot make that showing.

Counsel researched Pouncy's file, met with him several times, discussed Pouncy's alibi defense, hired an investigator, and performed admirably in jury selection. *Pouncy*, 846 F.3d at 162. Pouncy offers no cognizable evidence that this seasoned counsel could not ably try his case.

Pouncy points to counsel's deficiencies at various points in the pretrial process, including his alleged failure to interview witnesses, to file any motions, to investigate certain pieces of exculpatory evidence, or to meaningfully discuss the case with him. But Pouncy misunderstands his burden in proving a constructive denial claim. He must show that "counsel failed to oppose the prosecution throughout the [relevant] proceeding as a whole," not merely "that his counsel failed to do so at specific points." *Bell*, 535 U.S. at 697. In *Bell*, the Supreme Court held that a failure to present additional mitigating evidence or closing remarks did not meet the mark when counsel opposed the prosecution through an opening statement and cross-examination of its witnesses. *Id.* at 697–98. Pouncy's counsel similarly prepared to oppose the prosecution at points throughout the pretrial stage by researching his Pouncy's case, hiring an investigator, and discussing his defense with him.

Our decisions in *Phillips v. White*, 851 F.3d 567 (6th Cir. 2017), and *Mitchell v. Mason*, 325 F.3d 732 (6th Cir. 2003), do not help Pouncy. In the first case, counsel gave no opening statement, failed to investigate new evidence, and presented no mitigating evidence (new or otherwise). *Phillips*, 851 F.3d at 581. As for closing, he "reproached the jury for finding his guilt-

phase presentation unpersuasive" and said that he did not want to waste their time. *Id.* at 579. In the second case, counsel met with his client only for six minutes during the seven months preceding the trial, and he was suspended from the practice of law for the month preceding trial. *Mitchell*, 325 F.3d at 742–43. That is not remotely what happened here.

E.

*Public trial.* Pouncy argues that the state trial court violated his Sixth Amendment rights when it cleared the public from the courtroom before it handled the selection of a jury and handled some pretrial motions. The Michigan Court of Appeals, the last court to address this claim on the merits, disagreed. It noted Pouncy's argument that he had the "right to have the public present during certain motion hearings and voir dire." *Pouncy*, 2008 WL 9869818, at *27. And it rejected his claim on the merits. *Id.*

This ruling does not violate clearly established law. While the Sixth Amendment protects an accused's "right to a public trial," *Presley v. Georgia*, 558 U.S. 209, 212 (2010) (per curiam), a claimant must raise the right in order to give the trial court the opportunity to overcome the "presumption of openness" by explaining the need for a closed hearing, *Waller v. Georgia*, 467 U.S. 39, 45 (1984) (quotation omitted). In this instance, however, nobody objected when the trial court cleared the courtroom to prepare for jury selection. Having failed to invoke the right to an open trial then, Pouncy cannot invoke it now.

Pouncy counters that *Waller* clearly established the need for a court to balance the interests on its own. Not so. In that case, the State of Georgia moved to close a public hearing on a motion to suppress wiretap information. *Id.* at 42. In contrast to Pouncy, a defendant objected to the court's decision to close the hearing. *Id.* at 42 n.2. *Waller* thus does not cover this case, a point confirmed by Supreme Court decisions before and after *Waller*, all treating the right as forfeitable

if not raised at trial. *See, e.g.*, *Levine v. United States*, 362 U.S. 610, 618–19 (1960); *Singer v. United States*, 380 U.S. 24, 35 (1965); *Peretz v. United States*, 501 U.S. 923, 936 (1991).

Pouncy separately invokes *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984). But that decision turned on the First Amendment, not the Sixth Amendment. It stands only for the "clearly established" principle that members of the public have a right to ask for an open trial. *Id.* at 513. That holding does not help Pouncy.

F.

*Suppression of evidence.* Pouncy claims that the prosecution violated his due process rights by withholding allegedly exculpatory cellphone records. The postconviction trial court was the last to hear this claim on the merits. Pouncy argued that the prosecution "prevented [him] from discovering and presenting exculpatory evidence" of "complainant's phone records" from the first carjacking. R.8-22 at 62. The court noted that those phone records would be immaterial because the cell phone belonged to "Jacob Joe Woods," but "Earl Brady testified that [Pouncy] identified himself as Jacob Woods." R.8-37 at 15. It added that a call placed during the first carjacking has no "bearing on whether [Pouncy] committed the" second and third carjackings. R.8-37 at 15. In sum, it viewed "[t]he alleged newly discovered evidence" as "irrelevant." R.8-37 at 15.

This claim does not overcome AEDPA's deferential standard. Due process requires the prosecution to disclose evidence "favorable to an accused" "where the evidence is material." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Evidence is material if it would have "a reasonable probability" of affecting the trial. *Strickler v. Greene*, 527 U.S. 263, 280–81 (1999); *see Kyles v. Whitley*, 514 U.S. 419, 432–33 (1995).

The state court did not unreasonably determine that overwhelming evidence of guilt prevents Pouncy from showing that this evidence would have affected the trial. Seven witnesses

27

identified Pouncy as the ringleader of the carjackings, based both on his appearance and on his voice. Given the nature of Pouncy's scheme, each witness had extensive, repeated interactions with him. The witnesses had plenty of opportunities to view Pouncy before and at the time of the crime, which made their identifications more reliable. *See Neil v. Biggers*, 409 U.S. 188, 199–200 (1972). And they had a high "level of certainty" that Pouncy was indeed the culprit. *Id.* at 199. Each remained firm during Pouncy's cross-examination. Pouncy's accomplice and step-brother, Wayne Grimes, also corroborated each witness's account while testifying against Pouncy. No less importantly, had the records been produced, they would not have helped Pouncy. Prosecutors eventually learned that a third party bought the phone for "Jacob Joe Woods," the alias that Pouncy used during the carjackings.

### G.

*Elicitation of false testimony.* Pouncy, relatedly, claims that the prosecution violated his due process rights by eliciting allegedly false testimony about the suppressed cellphone records. In the postconviction trial court, the prosecution "misle[d] the defense" by telling them that the "phone calls from the perpetrator to the complainants weren't capable of being traced, when the phone calls were indeed capable of being traced to someone other than Defendant Pouncy." R.8-22 at 62. The state postconviction court rejected the claim on the merits.

The state court did not unreasonably apply clearly established federal law in rejecting that argument. Due process forbids the prosecution from knowingly using false testimony that has "any reasonable likelihood" of "affect[ing] the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976); *see Napue v. Illinois*, 360 U.S. 264 (1959). For the reasons just given, the allegedly false testimony had no reasonable likelihood of affecting the trial. *See Richter*, 562 U.S.

at 112.  The underlying cell phone records at most would have shown that "Jacob Joe Woods," Pouncy's alias, made the calls.  That would not have helped Pouncy, as just shown.

H.

*Failure to correct false testimony.*  Pouncy claims that the prosecution violated his due process rights by failing to correct the allegedly false testimony of Grimes about his criminal history.  Upon arrest, Grimes first denied involvement in the carjackings.  But he later admitted his guilt, implicating Pouncy and elaborating on their respective roles in the carjackings.  On cross-examination, Grimes explained that he lied initially because he had never been arrested and was scared.  That explanation itself was not true.  He had been arrested once before in Clio, Michigan.

Pouncy argued before the state postconviction trial court that he "was deprived of his right to due process due to the prosecution's failure to correct the false testimony of its 'star witness,' Wayne Grimes."  R.8-22 at 99.  The postconviction court believed that Pouncy procedurally defaulted this claim under Michigan Court Rule 6.508(D)(3) for not raising it on direct appeal or in a prior motion.  And it found no good cause for his failure to do so.  In the alternative, the court rejected the claim on the merits.

While it seems likely that Pouncy procedurally defaulted this claim and that AEDPA deference would apply to it, we need not resolve either point.  Even under fresh review, this claim fails.

Due process prohibits the prosecution from allowing "false evidence" "to go uncorrected when it appears."  *Napue*, 360 U.S. at 269.  As with elicitation claims, we ask whether the prosecution knew the testimony was false and whether the testimony has "any reasonable likelihood" of "affect[ing] the judgment of the jury."  *Agurs*, 427 U.S. at 103.  In the first place, there is no evidence that the prosecutor *knew* that the testimony was false.  Pouncy has provided

29

no evidence that the prosecutor accessed Grimes's prior arrest records from the Clio police. Nor has he provided any reason for the prosecutor to have investigated these records. In the second place, this minor falsity had no reasonable likelihood of affecting the outcome of trial given all of the evidence against him from Grimes and others.

Pouncy argues that the prosecutor did learn of the prior arrest. Grimes told the prosecutor in an earlier interview that he was arrested in May 2005 for carrying a concealed weapon, but this was a relatively innocuous detail of that interview compared to the detailed account that Grimes gave of the carjackings. We cannot say that learning of this fact is enough to ascribe real notice to the prosecutor during the trial. And we cannot fault the prosecutor for forgetting this "mere inconsistenc[y]" in Grimes's statements regarding this prior arrest—a minor part of Pouncy's lengthy impeachment of Grimes. *Rosencrantz*, 568 F.3d at 587 (quotation omitted).

Invoking *McNeill v. Bagley*, 10 F.4th 588 (6th Cir. 2021), Pouncy argues that this detail likely affected the trial. There, the witness's testimony was the "strongest evidence supporting [the defendant's] conviction," but we rejected the defendant's *Brady* claim because that witness already "contradicted himself" on that same point and that jury nonetheless "chose to credit [him] anyway." *Id.* at 604. Like the witness in *McNeill*, Grimes had already given other, far more significant, inconsistent testimony, making this relatively minor detail unlikely to change the trial's outcome. Recall that Grimes first denied involvement in the carjackings. But he later admitted his guilt, implicating Pouncy and elaborating on their respective roles in the carjackings. Extensive testimony placed Grimes (and Pouncy) at the crime scene. Impeaching this minor inconsistency had little likelihood of undermining the array of evidence against Pouncy.

For these reasons, we affirm in part, reverse in part, and remand this case for further proceedings consistent with this opinion.